DETHMERS MANUFACTURING
COMPANY, INC., Plaintiff,

v.

AUTOMATIC EQUIPMENT
MFG. CO., Defendant.

No. C 96–4061–MWB.

United States District Court,
N.D. Iowa,
Western Division.

Sept. 2, 1999.

David Tank of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, Iowa, and Michael Gilchrist and Brian J. Laurenzo of Dorsey & Whitney, LLP, Des Moines, Iowa, for Plaintiff Dethmers Manufacturing Company, Inc.

Donald R. Schoonover of Fremont Hills, Missouri, Tim Engler of Harding, Shultz & Downs, Lincoln, Nebraska, Defendant Automatic Equipment Manufacturing Company.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF PATENT INVALIDITY AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND TO DISMISS FOR LACK OF CONTROVERSY

BENNETT, District Judge.

### TABLE OF CONTENTS

I. INTRODUCTION ..................................................946
   A. Procedural Background...............................................946
   B. Factual Background.................................................949
      1. The '166 patent ................................................949
      2. The '240 and Re482 patents ....................................950
      3. The '851 patent ...............................................951
      4. The Parent–Automatic–Dethmers triangle ......................953
      5. Facts relevant to false advertising and false marking claims ............955
II. LEGAL ANALYSIS...................................................955

A. The '851 Patent .................................................955
   1. Subject matter jurisdiction ..................................955
      a. The parties' contentions .............................955
      b. Subject matter jurisdiction in patent cases ............956
      c. Subject matter jurisdiction here .....................957
        i. Explicit threat and reasonable apprehension ........957
        ii. Present activity of the alleged infringer ...........960
   2. Summary ...............................................960
B. The '166 Patent Revisited .......................................961
   1. Contentions of the parties .................................961
   2. Prosecution history estoppel ...............................961
      a. The nature of prosecution history estoppel ...........962
      b. The Warner–Jenkinson presumption ..................964
   3. Prosecution history estoppel here ...........................966
      a. Prosecution history ................................966
      b. Presumption and rebuttal ..........................971
C. False Advertising ...............................................973
   1. Which circuit's law applies? ................................974
   2. Summary judgment standards ...............................974
   3. Elements of this "false advertising" claim ...................975
   4. The record evidence ......................................978
      a. The "patented flex joint" representation .............978
        i. Falsity .......................................979
        ii. Injury ........................................980
      b. The infringement representations ...................982
D. False Marking .................................................982
III. CONCLUSION .................................................984

In ruling on the parties' first round of dispositive motions, the court found that the "devil was in the details" in granting summary judgment of invalidity of one of the plaintiff's patents in suit, declining to grant summary judgment of non-infringement of the defendant's patent in suit, and in ruling on various challenges to other patent and non-patent claims. *See Dethmers Mfg. Co., Inc. v. Automatic Equip. Mfg. Co.,* 23 F.Supp.2d 974 (N.D.Iowa 1998). Details appear just as likely to bedevil the second round of dispositive motions in this case, as the court is called upon to consider the invalidity of yet another of the plaintiff's patents, reconsider "equivalents" infringement of the defendant's patent in suit in light of recent decisions of the Federal Circuit Court of Appeals on prosecution history estoppel, and address a new set of challenges to various other claims.

## I. INTRODUCTION

### A. Procedural Background

The parties to this lawsuit are both makers of tow bars used to tow an automobile behind a recreational vehicle (R.V.) and the patents in suit relate to such tow bars. Plaintiff Dethmers Manufacturing Company, Inc.,[1] filed this action on June 26, 1996, seeking primarily a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, of non-infringement of a patent owned by defendant Automatic Equipment Manufacturing Company[2] and declaratory, injunctive, and damages relief for Automatic's alleged infringement of one of Dethmers's patents.

More specifically, in Count I of its second supplemental amended complaint, filed on November 20, 1997, Dethmers sought declaratory judgment that the tow bars Dethmers manufactures do not infringe one of Automatic's patents, United States Patent No. 5,356,166 (the '166 patent or

---

1. Dethmers is an Iowa corporation with its principal place of business in Boyden, Iowa.

2. Automatic is a Nebraska corporation with its principal place of business in Pender, Nebraska.

the Automatic patent), that the '166 patent is invalid and unenforceable, and that Automatic is without right or authority to threaten or to maintain suit against Dethmers for alleged infringement of the '166 patent. Count II sought damages for, as well as injunctive and declaratory relief from, infringement by Automatic of Dethmers's own patent, United States Patent No. Re32,482 (the Re482 patent or the Dethmers reissue patent), which is a reissue of United States Patent No. 5,232,240 (the '240 patent or the Johnson patent), a patent Dethmers alleges it acquired from the successors in interest to the inventor, Andrew B. Johnson of Barton, North Dakota. Count III sought compensatory and punitive damages and injunctive relief for Automatic's alleged breach of a contract with Dethmers, as the assignee of Richard A. Parent, not to produce products incorporating the "Parent Invention" without permission or payment of consideration. Count IV sought compensatory and punitive damages and injunctive relief for "statutory" misappropriation by Automatic of a trade secret, the "Parent Invention." Count V was a comparable "common-law" claim of misappropriation of a trade secret, also seeking compensatory and punitive damages and injunctive relief. Count VI alleged conversion of the "Parent Invention" and sought compensatory and punitive damages and injunctive relief. Count VII alleged misappropriation of the "intellectual property" of Dethmers, again identified as the "Parent Invention," and sought compensatory and punitive damages and injunctive relief. Finally, Count VIII alleged unjust enrichment by Automatic as the result of its use of design concepts of the "Parent Invention" in its products, and sought compensatory and punitive damages and injunctive relief.

On December 5, 1997, instead of answering the second supplemental amended complaint, Automatic filed the first of the dispositive motions ruled upon in the court's prior decision, a motion to dismiss or in the alternative for partial summary judgment, for more definite statement, and

to strike. On March 11, 1998, Automatic filed a motion for summary judgment on the invalidity of the Dethmers reissue patent, the Re482 patent. On June 2, 1998, Dethmers took the offensive with its own motion for summary judgment or in the alternative partial summary judgment, asserting that it was entitled to summary judgment that it is not liable for infringing Automatic's '166 patent on grounds of invalidity and unenforceability of the patent itself, and non-infringement of the patent by Dethmers's tow bars.

In its order of September 29, 1998, on the parties' first round of dispositive motions, the court ruled as follows:

1. Automatic's December 5, 1997, motion to dismiss or in the alternative for partial summary judgment, for more definite statement, and to strike is granted as to summary judgment on all prayers for punitive damages on state-law claims, but otherwise denied.

2. Automatic's March 11, 1998, motion for summary judgment on the invalidity of the Re482 patent is denied as to insufficiency of "errors," and assertion that the reissue patent is not for the "same invention" as the original '240 patent, but granted as to the inadequacy of the reissue declaration, on the ground that it does not comply with the detail required by the decisions of the Federal Circuit Court of Appeals in *Nupla* [*Corp. v. IXL Mfg. Co., Inc.*, 114 F.3d 191 (Fed.Cir.1997),] and [*In re*] *Constant,* [827 F.2d 728 (Fed.Cir.1987), *cert. denied,* 484 U.S. 894, 108 S.Ct. 251, 98 L.Ed.2d 209 (1987),] and the former version of 37 C.F.R. § 1.175, and the Re482 patent is hereby declared invalid.

3. Dethmers June 2, 1998, motion for summary judgment or in the alternative partial summary judgment on patent invalidity, unenforceability, and non-infringement is denied in its entirety.

*Dethmers Mfg. Co., Inc.,* 23 F.Supp.2d at 1044. The court subsequently denied Dethmers' motion to reconsider, but certi-

fied its ruling on the first set of dispositive motions for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). *Dethmers Mfg. Co., Inc. v. Automatic Equip. Mfg. Co.,* No. C 96–4061–MWB, Order on Motion to Reconsider or in the Alternative to Certify for Interlocutory Appeal (Nov. 4, 1998). No notice of such an interlocutory appeal was ever filed in this case, however.

Following the court's ruling on the first set of dispositive motions, Automatic answered the second supplemental amended complaint. In that Answer, filed on October 14, 1998, in addition to denials and affirmative defenses, Automatic also asserted several counterclaims. In Count I of its counterclaims, Automatic seeks declaratory judgment that Dethmers's original '240 patent and its Re482 patent are invalid, unenforceable, and not infringed by Automatic's products. In Count II, a "false advertising" claim under the Lanham Act, Automatic asserts that Dethmers has violated 15 U.S.C. § 1125(a) by falsely asserting that its tow bar contains a "patented flex joint" and falsely asserting that Automatic is infringing Dethmers's patent rights. Automatic seeks injunctive relief on this count. In Count III, Automatic accuses Dethmers of "false marking" in violation of 35 U.S.C. § 292 and seeks imposition of an appropriate fine under the statute, as well as an award of one-half of the fine to Automatic pursuant to § 292(b). In Count IV of its counterclaim, Automatic asserts that Dethmers is infringing Automatic's '166 patent and seeks appropriate declaratory, injunctive, and damages relief. Finally, in Count V of its counterclaim, Automatic seeks declaratory judgment of non-infringement, invalidity, and unenforceability of Dethmers's United States Patent No. 5,765,851 (the Parent patent or the '851 patent). Dethmers filed its reply to Automatic's counterclaims on November 6, 1998.

On March 10, 1999, Dethmers filed its Third Amended and Substituted Complaint. This amended complaint reasserted all counts of the Second Supplemental and Amended Complaint, as detailed above, but added that the claims in Counts III through VIII were governed by Nebraska law, in light of this court's ruling on the first set of dispositive motions so holding. In addition, this latest amended complaint added two new counts, Counts IX and X, which assert promissory estoppel and quantum meruit, respectively, relating to the "Parent invention." Automatic answered the Third Amended and Substituted Complaint on March 19, 1999, denying Dethmers's new claims and reiterating Automatic's denials, defenses, and counterclaims as stated in answer to Dethmers's second supplemental amended complaint, as detailed above. Dethmers filed its reply to the renewed counterclaims on April 1, 1999.

The present round of dispositive motions began on June 15, 1999, when defendant Automatic filed its Motion for Summary Judgment of Invalidity of U.S. Patent No. 5,765,851. Automatic asserts that the '851 patent is invalid for failure to comply with 35 U.S.C. § 102(b), because the invention was "on sale" and in "public use" more than one year prior to the filing date of the application for the '851 patent. On June 16, 1999, Dethmers filed its Motion for Summary Judgment and to Dismiss for Lack of Controversy, asserting that there is no present controversy between Automatic and Dethmers regarding the '851 patent, that Dethmers is entitled to summary judgment on Automatic's "false advertising" claim under 15 U.S.C. § 1125(a) and "false marking" claim under 35 U.S.C. § 292, and that Dethmers is entitled to summary judgment on both its claim of non-infringement and Automatic's claim of infringement of the '166 patent, on the ground that Automatic's claim of infringement is barred by prosecution history estoppel. This last contention revisits grounds raised in the prior round of dispositive motions, but which this court declined to resolve in light of genuine issues of material fact.

Briefs, resistances, and replies have now been filed on the present dispositive motions and the court heard oral arguments on August 26, 1999. Plaintiff Dethmers Manufacturing Company, Inc., was represented at the oral arguments by David Tank of Davis, Brown, Koehn, Shors & Roberts, P.C., in Des Moines, Iowa, and Michael Gilchrist and Brian J. Laurenzo of Dorsey & Whitney, LLP, also in Des Moines, Iowa. Defendant Automatic Equipment Manufacturing Company was represented at the oral arguments by Donald R. Schoonover of Fremont Hills, Missouri, and by Tim Engler of Harding, Shultz & Downs in Lincoln, Nebraska. The briefing in this case was of exceptional quality and the record evidence was well documented. Furthermore, although the issues involved are clearly very contentious, the oral arguments were not only excellent, but were conducted with the utmost civility. Because trial in this matter is currently set to begin on October 18, 1999, the court has moved with speed, but not with haste, to provide as prompt a ruling on the present motions as due consideration of the merits would permit.

### B.  Factual Background

The court will discuss here only the nucleus of facts pertinent to the present motions for summary judgment, partial summary judgment, or to dismiss. In its legal analysis, the court will address, where necessary, the parties' arguments concerning the correct treatment of factual allegations or their assertions of genuine issues of material fact, which the parties contend are dispositive of the motions now before the court.

As mentioned above, and discussed in greater detail in this court's ruling on the prior round of dispositive motions, *see Dethmers Mfg. Co., Inc.,* 23 F.Supp.2d at 983–98, both parties make tow bars, based on their respective patents, for towing an automobile behind a recreational vehicle. A comparatively brief reprise of the nature of the patents discussed in more detail in the court's prior ruling (Automatic's '166 patent and Dethmers's '240 and Re482 patents) is appropriate here, as is a slightly more detailed discussion of the patent newly introduced into this litigation by Automatic's counterclaims, the Dethmers '851 patent. However, it is the history surrounding the application for and issuance of the '851 patent and the timing of Automatic's production of allegedly infringing products that is of primary interest here, rather than the question of whether any of Automatic's products literally or equivalently infringes the '851 patent. Thus, even for this patent, the discussion here will not consider the nature of the invention in as exhaustive detail as the court gave the patents at issue in the prior round of dispositive motions.

### 1.  The '166 patent

Automatic's '166 patent, which issued on October 18, 1994, is for an "Arrestably Lockable Telescoping Tow–Bar Assembly." The Abstract of the patent describes the invention as follows:

> An improved locking mechanism for an arrestably lockable telescoping tow bar assembly comprises a slidable latch member surrounding balls-containing sideward openings of an outer tube that are radially alignable with an outside groove of a telescopingly associated inner tube, the slidable latch member including a medial cam portion slidably surrounding the outer tube between a surrounding retainer ring augmentation therefor and the balls-containing sideward openings therefor; a cover slidably surrounding a trailward part of the slidable latch member and being trailwardly immovable along the outer tube; and a helical spring means actuatably extending between the cover member and the slidable latch member.

Patent No. '166, p. 1.[3] In other words, in the invention described in this patent, the

---

**3.** Illustrations of the invention defined by     the '166 patent, as well as the statement of the

inner tube of the telescoping assembly is locked in place when the "balls" align with the "outside groove" on the inner tube and the balls are pushed down into the groove by the "cam portion," which is in turn pushed into the locking position by the "helical spring." The claimed invention consists of five claims, only the first of which is "independent," and all the rest of which are "dependent" upon claim 1.

As interpreted in pertinent part by the court in its prior ruling, the '166 patent is for a locking mechanism for a tow bar arm that involves the following: a groove "circularly surrounding" the inner of two telescoping tubes, that is, a single continuous groove describing a complete circle around the inner tube, *Dethmers Mfg. Co., Inc.*, 23 F.Supp.2d at 1037; a "cam portion" that is a sliding piece that converts linear motion along the longitudinal axis of the telescoping arms of the tow bar into linear motion in a perpendicular direction, *i.e.*, "radially" inward and outward from the longitudinal axis of the inner tube, to push the locking balls or members into locking position in the groove, *Id.* at 1039; and a helical spring means between a cover member and the slidable latch member medially-located cam portion that pushes the cam portion into the locking position. *Id.*

The court concluded in its prior ruling that Dethmers's tow bars do not literally infringe these limitations, because they have at least two grooves that together define no more than a 240-degree arc of a circle around the inner tube, *see id.* at 1037, and the helical spring on the Dethmers tow bar is not "between" the "cam" and any "cover," but between the "cam" and a part that is not a "cover," but instead a part between the "cam" and the inner tube; *i.e.*, there is no "cover" in the Dethmers tow bar apart from the "cam" itself. *See id.* at 1039. The court concluded that summary judgment was not appro-

priate on the question of infringement under the doctrine of equivalents—although the court was of the opinion that comparable parts of the Dethmers tow bar locking mechanism performed the same function, in the same way, with the same result—because of genuine issues of material fact concerning prosecution history estoppel. *See id.* at 1038 & 1039–40. Dethmers asks the court to revisit the question of whether the applicability of prosecution history estoppel is ripe for determination in the present round of dispositive motions.

### 2. The '240 and Re482 patents

Although not directly at issue in the present motions for summary judgment, the Dethmers '240 and Re482 patents are nonetheless pertinent to Dethmers's summary judgment motion concerning Automatic's "false advertising" and "false marking" counterclaims. As noted in this court's prior ruling, *see id.* at 988–93, the '240 patent is for a "Towing Hitch" involving both a "pivot block," which allowed the hitch to pivot vertically and horizontally, as well as to swivel about an axis parallel to the ground, and a pair of foldable tow arms that could be locked in either the folded or extended positions.[4] Only the first of the three claims of this patent, the claim including a frame, pivot block, and tow arms, is "independent"; the two additional claims, stating a means for locking the pivot block in storage position, and defining the pivotal connection of the pivot block to the forward portion of the tow hitch, respectively, are "dependent" upon the first claim.

The Re482 patent is a reissue of the '240 patent, issued on March 25, 1997, after Dethmers acquired the '240 patent from the successors in interest to the original inventor, Andrew B. Johnson of Barton, North Dakota, Johnson's wife and brother. In the Re482 patent, portions of claim 1 of

---

claims of the patent, can be found in the court's prior ruling. *See Dethmers Mfg. Co., Inc.*, 23 F.Supp.2d at 984–88.

4. An illustration of this invention, and the statement of the specific claims of the patent, appear in the court's prior ruling. *See Dethmers Mfg. Co., Inc.*, 23 F.Supp.2d at 989–991.

the '240 patent were deleted, as was any reference in new claim 1 to "arms." The language of claims 2 and 3 of the '240 patent was not altered in any way, although those claims were made dependent upon a different, independent claim 1 in the Re482 patent; that is, they are now dependent on a claim with no pivot arms. New claims 4 through 10 were added to the reissue patent. However, the new claims, *inter alia,* reintroduce the pivot arms formerly part of claim 1 as independent claims. *See id.* at 991–93. In its prior ruling, the court invalidated the Re482 patent for failure to comply with the detail required for a reissue declaration. *See id.* at 1022–26.

### 3. The '851 patent

The patent newly introduced into the litigation by Automatic's counterclaims is United States Patent No. 5,765,851 (the '851 patent or the Parent patent), a patent for a "Self–Aligning Towing Apparatus." It incorporates elements of the invention referred to in the court's prior decision as the "Parent invention." *See, e.g., Dethmers Mfg. Co., Inc.,* 23 F.Supp.2d at 993–94. The patent shows that it is a continuation of Ser. No. 285,224, for which application was made on August 3, 1994, but which was later abandoned. Application for the patent was subsequently made on February 21, 1996, and the patent issued on June 16, 1998. The inventor is shown as Richard A. Parent and Dethmers is shown as the assignee.

For the present purposes, it will suffice to repeat the description of the invention in the abstract of the patent, and to include the first five figures illustrating the invention. The abstract states the following:

A storable self-aligning towing assembly which allows universal pivoting about three axes between a towing vehicle and a towed vehicle. The towing assembly is self-supporting. A hitching member is releasably attached to a towing vehicle at a first end of the hitching member; a first yoke member is pivotally attached to a second end of the hitching member such that the first yoke member pivots about a first axis which is generally horizontal and is normal [sic] an extended longitudinal axis of the hitching member; a second yoke member is connected to the first yoke member such that the second yoke member is free to rotate with respect to the first yoke member about an axis that is generally parallel to an extended longitudinal axis of the hitching member; a towed vehicle attachment means is releasably attached at a first end to a towed vehicle; the towed vehicle attachment means is pivotally attached to the second yoke member such that the second yoke member pivots with respect to the towed vehicle attachment means about a second axis which is generally vertical and is normal to the extended longitudinal axis of the hitching member. The configuration allows the towing assembly to pivot from a towing position to a storage position on the rear of the towing vehicle. A latching mechanism secures the self-aligning towing assembly in the storage position on the rear of the towing vehicle. The self-aligning towing assembly may be further converted into a shipping position.

United States Patent No. 5,765,851, Exhibit H, Plaintiff's Statement of Uncontested Facts in Support of Its Motion for Summary Judgment or in the Alternative Partial Summary Adjudication (Patent No. '851), p. 1. The invention is illustrated in the patent as follows:

FIG. 1

FIG. 2

FIG. 3

FIG. 4

## FIG.5

## FIG.5A

### 4. The Parent–Automatic–Dethmers triangle

The parties still agree that the figure who stands at the nexus between Automatic's and Dethmers's development of new generation tow bars is Richard Parent, although they now appear to assert more far-reaching factual disputes concerning Parent's relationship with each company and his impact on the development of each company's new generation tow bars. Again, the court will not attempt here to resolve—or even identify—all of the factual disputes concerning Parent's involvement with the litigants, only to provide a context for the legal analysis to follow.

It is undisputed that, on about February 28, 1993, in Pomona, California, Parent

approached William A. Bachman, an engineer employed by Automatic, with sketches he had made of a new type of tow bar that involved a swivel or universal joint and folding tow bar arms. The tow bar could also be folded up on the back of an R.V. for storage when not in use. These ideas are referred to herein as the "Parent invention." Parent apparently hoped that Bachman would bring his invention to the attention of Automatic's management and that some kind of agreement for manufacturing such a tow bar could be worked out. The parties dispute whether the plan envisioned by Parent and/or Bachman was for some kind of "joint" development and production or a "licensing" of Parent's design. The parties apparently do not dispute that Parent left it to Bachman to decide whether he would show Parent's design ideas to Jay Hesse, Automatic's President, but that Parent requested that Bachman keep Parent's ideas confidential if he decided not to pursue them. However, no written confidentiality or other agreement came out of Parent's meeting with Bachman. Hesse later declined to sign a non-disclosure letter Parent sent him in May of 1993.

Parent did not actually give Bachman his drawings at the time of the meeting in Pomona, although he sent Bachman copies of his drawings on or about March 5, 1993. Back in Pender, Nebraska, in Automatic's R & D shop, Bachman, working from his memory of Parent's invention, combined some of Parent's ideas with an idea he and another Automatic engineer had been exploring for telescoping tow bar arms to produce a prototype tow bar, which was shown to Hesse on or about March 4 or 5, 1993. On July 20, 1993, Automatic notified Parent that a prototype tow bar embodying his swivel joint would be sent to Blacksburg, Virginia, for trials on the motorhome of Ivan Mullenix, an independent sales representative for Automatic. That prototype was installed on Mullenix's motorhome, with Parent present, on August 6, 1993, but Parent and Dethmers assert that the prototype did not embody all of Parent's ideas and that Parent in fact objected to the development of a prototype in the absence of a licensing agreement for his ideas. Automatic eventually marketed a tow bar based on the prototype tried by Ivan Mullenix as its AVENTA brand in 1994, but Automatic and Parent never came to an agreement on rights to or licensing of Parent's ideas. The parties dispute the extent to which Bachman's prototypes or the AVENTA tow bar actually incorporated Parent's invention. Parent and Automatic were never able to reach a final agreement for joint production, assignment of rights, or licensing of a tow bar including the "Parent invention."

Parent subsequently approached a Dethmers employee with his design ideas at a recreational vehicle show in the spring of 1994. Dethmers was interested in Parent's invention, but first initiated a patent search. That search turned up the Johnson '240 patent. After Dethmers had obtained the rights to the '240 patent, it concluded negotiations with Parent by entering into a "Patent Assignment–Royalty Agreement." Dethmers then began prosecuting the Parent '851 patent as Parent's assignee, as well as prosecuting a reissue of the Johnson '240 patent. In support of Petitions to Make Special filed in the prosecution of both the Re482 patent and '851 patent, Dethmers asserted that prompt processing of its applications was required, because of concerns that Automatic was manufacturing a product that would infringe the claims of the patents. The original '240 patent was eventually reissued as the Re482 patent on March 25, 1997, and the Parent patent was eventually issued as the '851 patent on June 16, 1998. About six months prior to issuance of the '851 patent, Automatic stopped producing the AVENTA tow bar. However, Automatic contends that, because of the long life of its tow bars, it will continue to repair AVENTA tow bars at least through the period the '851 patent provides protection and that some of those repairs may rise to

the level of infringing "re-manufacturing" or "reconstruction."

Dethmers produced its own tow bar with a swivel joint and telescoping arms, rather than square folding arms as shown in the Johnson and Parent patents, during 1995. Dethmers apparently does not dispute that it developed telescoping arms by attempting to "design around" Automatic's '166 patent. Dethmers's tow bars were originally marketed under the brand name "KAR–BAR," but were later marketed under the brand name "EXCALI–BAR."

### 5. Facts relevant to false advertising and false marking claims

Although Automatic's "false advertising" and "false marking" claims do not involve infringement, they nonetheless involve the '240 patent. Dethmers contends that its executives believed that the '240 patent covered the EXCALI–BAR tow bars, and thus advertised its EXCALI–BAR as featuring a "patented flex joint." The EXCA-LI–BAR bore a mark indicating that it was covered by the '240 patent, and after the Re482 patent was applied for, also bore a mark indicating that the tow bars were made with a patent pending. Dethmers's tow bars were advertised in magazines and brochures distributed by dealers or at trade shows. Automatic also alleges that one or more of Dethmers's sales representatives told customers that Automatic was infringing Dethmers's patents, that Automatic would not be able to "design around" Dethmers's patents, and that consequently Automatic would soon be out of the tow bar business.

## II. LEGAL ANALYSIS

In its legal analysis, the court will address first the cross-motions for summary judgment or to dismiss concerning the '851 patent. The court will then turn to Dethmers's motion for summary judgment on both its claim of non-infringement and Automatic's counterclaim of infringement of the '166 patent, then finally to Dethmers's motion for summary judgment on Auto-

matic's "false advertising" and "false marking" counterclaims.

### A. The '851 Patent

Although Automatic was the first to move for summary judgment concerning the '851 patent—seeking summary judgment on Count V of its counterclaim, which alleges that the '851 patent is invalid under the "on sale" and "public use" bars of 35 U.S.C. § 102(b)—the court must first take up the portion of Dethmers's motion which seeks to dismiss Automatic's counterclaim concerning this patent, because Dethmers's motion contests the court's subject matter jurisdiction to hear the pertinent counterclaim at all. If the counterclaim is not properly before the court, of course, the court will not reach Automatic's assertions of patent invalidity.

### 1. Subject matter jurisdiction
#### a. The parties' contentions

In its June 16, 1999, Motion for Summary Judgment and to Dismiss for Lack of Controversy, Dethmers contends that the court should dismiss Automatic's counterclaim for declaratory judgment concerning the '851 patent, because there is no explicit threat of action by Dethmers and no present activity by Automatic that could constitute infringement. More specifically, Dethmers contends that there is no explicit threat of action by Dethmers indicating an intent to enforce patent rights, even though Dethmers filed a statement with the United States Patent and Trademark Office (the PTO) in prosecuting the Parent patent in which Dethmers asserted that Automatic was infringing the claims of the patent application. Dethmers points out that at the time the statement was filed, Automatic was making and selling the AVENTA tow bars, which clearly did fall within the scope of the pending application. However, two things subsequently happened: (1) at least six months before the Parent patent was actually issued, Automatic ceased making the AVENTA tow bar; and (2) the claims of the patent appli-

cation were amended after the statement was made, limiting its applicability only to the AVENTA tow bar of Automatic's products. Dethmers suggests that it might have been attempting to enter into licensing negotiations with Automatic, and such negotiations cannot give rise to a litigation controversy until the negotiations break down. Dethmers also contends that its pursuit of non-patent claims concerning the Parent invention does not support an actual controversy concerning the Parent patent, because the trade secrets of the Parent invention were broader than the claims actually allowed in the Parent patent. Automatic counters, however, that there are "explicit threats" sufficient to establish an actual controversy, because of Dethmers's actions during prosecution of the Parent patent, Dethmers's present allegations against Automatic, and a threatening letter to Automatic from an attorney representing Parent. Furthermore, Automatic contends that, since 1994, Dethmers's sales personnel have made comments to customers that Dethmers was going to stop Automatic from making and offering towing products and accessories.

Turning to the second prong of the inquiry, Dethmers contends that there is no present activity by Automatic that could constitute infringement, because Automatic is no longer making the AVENTA tow bar. Dethmers contends that the Parent patent requires that the pivots of the tow bar be in the order vertical, swivel, horizontal, as ordered from the towing R.V. to the towed vehicle, and that only Automatic's AVENTA tow bar has ever had the pivots in that order. In short, Dethmers contends that Automatic is not currently engaged in making any products that infringe the '851 patent. Automatic argues, however, that it is or may be engaged in potentially infringing activity, because from time to time it repairs AVENTA tow bars, and such repairs may rise to the level of "re-manufacturing" that constitutes infringement. Automatic also argues that

its customers' continued "use" of AVENTA tow bars, which are rugged and long-lived products, may also constitute infringement under 35 U.S.C. § 271, resulting in possible claims back against Automatic by customers Dethmers may charge with infringing its patents.

### b. Subject matter jurisdiction in patent cases

■ The Federal Circuit Court of Appeals recently reiterated the standards for determining the court's subject matter jurisdiction over a declaratory judgment action concerning infringement, enforceability, or validity of a patent, such as Count V of Automatic's counterclaim concerning the '851 patent:

> Under the Declaratory Judgment Act, 28 U.S.C. § 2201(a) (1994), a district court has jurisdiction over a declaratory judgment action only when there is an "actual controversy." "Whether an actual controversy exists upon particular facts is a question of law, and is subject to plenary appellate review." *BP Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 978, 28 USPQ2d 1124, 1127 (Fed.Cir.1993). For an actual controversy to exist, "[t]here must be both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." *Id.* at 978, 4 F.3d 975, 28 USPQ2d at 1126.

*Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 855 (Fed.Cir.1999); *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1326 (Fed.Cir. 1998) (same two-step inquiry), *cert. denied*, —— U.S. ——, 119 S.Ct. 1037, 143 L.Ed.2d 45 (1999); *Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1481 (Fed.Cir. 1998) (same two-step inquiry).[5] "In this

---

5. Although the "actual controversy" inquiry is    a question of law, "the district court's under-

inquiry, the 'first prong looks at the [patentholder's] conduct; [the] second to that of [the declaratory judgment] plaintiff.' " *Hunter Douglas, Inc.*, 153 F.3d at 1326 (quoting *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736 (Fed. Cir.1988)). Furthermore, " '[a]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.' " *Quadlux, Inc.*, 172 F.3d at 855 (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975)). The court will explore the requirements of each prong of the inquiry in more detail in its application of the test below.

### c. Subject matter jurisdiction here

**■** *i. Explicit threat and reasonable apprehension.* On the first prong of the "actual controversy" inquiry, it is not just the patentholder's conduct that matters, but the effect of that conduct upon the alleged infringer, because this prong requires " 'an explicit threat or other action by the patentee, which creates a *reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit.'* " *Hunter Douglas, Inc.*, 153 F.3d at 1326 (quoting *Cygnus Therapeutics Sys. v. ALZA Corp.*, 92 F.3d 1153, 1159 (Fed.Cir.1996), with emphasis added by the *Hunter Douglas* court). Thus, this prong is sometimes referred to as the "reasonable apprehension" inquiry. *See, e.g., id.* at 1327. Nevertheless, as to the patentholder's conduct, the Federal Circuit Court of Appeals "ha[s] consistently required that, for a district court to exercise jurisdiction over a declaratory judgment action in which the plaintiff complains of noninfringement, invalidity, or unenforceability, the plaintiff must allege 'acts of defendant indicating an intent to enforce its patent.' " *Id.* (quoting *Arrowhead*, 846 F.2d at 737).

In other words, "for an actual controversy more is required than the existence of an adversely held patent." *BP Chems.*, 4 F.3d at 978, 28 U.S.P.Q.2d at 1126. We have maintained this requirement, for it "protects quiescent patent owners against unwarranted litigation" under Title 35. *Arrowhead*, 846 F.2d at 736, 6 U.S.P.Q.2d at 1689. The "reasonable apprehension" prong of the two-part test thus contributes to policing the boundary between a constitutional controversy, which is judicially cognizable under the Declaratory Judgment Act, and "a difference or dispute of a hypothetical or abstract character," *Aetna*, 300 U.S. at 240, 57 S.Ct. 461, which is not. Accordingly, because the allegations do not support a reasonable apprehension on Hunter Douglas's part, there is no actual controversy.

*Hunter Douglas, Inc.*, 153 F.3d at 1326–27.

In *Quadlux*, there was no actual controversy extant at the time of appellate review of the declaratory judgment claim—even though an actual controversy had previously existed—because, prior to appellate review, Quadlux had entered into a covenant not to assert a patent infringement claim against Amana, removing any reasonable apprehension that Amana would face an infringement suit based on its activities before the date the covenant was filed. *Quadlux, Inc.*, 172 F.3d at 855. The Federal Circuit Court of Appeals held further that the declaratory plaintiff could not assert reasonable apprehension of being sued with regard to products "in the pipeline," but not advertised, manufactured, marketed, or sold before the filing date, because "an actual controversy cannot be based on a fear of litigation over future products." *Id.* Similarly, in *Hunter Douglas*, the court found that the declaratory action had been properly dismissed, because "Hunter Douglas did not allege that the Defendants have signaled an in-

---

lying factual findings, including whether a defendant has made a sufficient threat of infringement and whether a plaintiff was placed in reasonable apprehension of suit, are re-

viewed for clear error pursuant to Fed. R. Civ. P. 52(a)." *Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.*, 142 F.3d 1266, 1273 (Fed.Cir. 1998).

tention, in any way, to file suit claiming infringement of the Harmonic patents by Hunter Douglas's future product." *Hunter Douglas, Inc.*, 153 F.3d at 1326. Furthermore, threats before a patent issues are of no moment, because the Federal Circuit Court of Appeals has held "that a threat is not sufficient to create a case or controversy unless it is made with respect to a patent that has issued before a complaint is filed." *GAF Building Materials Corp. v. Elk Corp. of Dallas*, 90 F.3d 479, 482 (Fed.Cir.1996) (holding that the district court correctly dismissed the case for lack of a justiciable controversy where the patent in question had not issued at the time the declaratory judgment complaint was filed, and subsequent issuance of the patent did not cure the defect, because the alleged infringer failed to seek leave to amend the pleadings).

In contrast, in *Dainippon Screen Manufacturing*, the Federal Circuit Court of Appeals found sufficient evidence of "threats" by the patentholder to satisfy this prong of the inquiry. *See Dainippon Screen Mfg. Co., Ltd.*, 142 F.3d at 1273. In that case, there had been a meeting between representatives of the alleged infringer, Dainippon, and the patentholder, CFMT, both makers of semiconductors, at which Dainippon presented information relating to its apparatus and indicated an intention to display the apparatus at a trade show. *Id.* at 1268. After Dainippon's presentation, representatives of CFMT "asserted that there was an 'infringement problem.'" *Id.* Further,

> Shortly thereafter, Heinrich Parker, outside counsel for both CFM and CFMT, telephoned Roderick Thompson, Dainippon's outside counsel, in San Francisco and left a message which stated in relevant part:
>
>> We believe that we've got good, strong, multiple patents in this field. I have been told that [Dainippon] has known about them for years. We are a well-funded/capitalized company and we intend to protect our rights....

> We do not think your client should be proceeding unilaterally to show at this show and if they do of course we're going to have to consider how we will handle that. We will not be afraid to protect our rights.

Thompson's Transcription of Parker's Voice Mail Message, June 23, 1995. Parker thereafter reiterated that his clients would not agree to refrain from suing Dainippon and that Dainippon would exhibit the FL–820L "at its peril." Dainippon did not display the FL–820L at SEMICON West.

*Dainippon Screen Mfg. Co., Ltd.*, 142 F.3d at 1268. During the course of further licensing negotiations between Dainippon and CFMT, CFMT initiated infringement actions against other competitors over the same patent in question between Dainippon and CFMT. *Id.* When licensing negotiations failed, Dainippon brought a declaratory judgment action. *Id.* In light of these facts, the Federal Circuit Court of Appeals found that the district court properly exercised subject matter jurisdiction over the declaratory judgment action. *See id.* at 1273.

Here, none of the alleged "threats" by Dethmers is sufficient to create in Automatic a "reasonable apprehension" of being sued for infringement of the '851 patent. *Quadlux, Inc.*, 172 F.3d at 855; *Hunter Douglas, Inc.*, 153 F.3d at 1326. First, nothing in the application and prosecution of the '851 patent constitutes the requisite threat, because "a threat is not sufficient to create a case or controversy unless it is made with respect to a patent that has issued before a complaint is filed." *GAF Building Materials Corp.*, 90 F.3d at 482. Although the '851 patent issued before Automatic filed its declaratory judgment claim, the statements upon which Automatic relies as creating its "reasonable apprehension" were made prior to issuance of the patent—that is, the "threats" were *not* made with respect to a patent that had issued. *Cf. id.* Just as "an actual controversy [requires] more ...

than the existence of an adversely held patent," *Hunter Douglas, Inc.,* 153 F.3d at 1326–27 (quoting *BP Chems.,* 4 F.3d at 978), this court believes an actual controversy requires more than statements made in support of an application for the patent in question.

Furthermore, there is nothing in Dethmers's conduct since the '851 patent issued that "signaled an intention, in any way, to file suit claiming infringement of the ['851 patent] by [Automatic's] product." *Hunter Douglas, Inc.,* 153 F.3d at 1326. Although Automatic makes much of Dethmers's prosecution of non-patent claims related to the Parent invention in this litigation, those claims clearly *do not* relate to *infringement* of the '851 patent, but to Automatic's allegedly wrongful acquisition of Parent's trade secrets, which were broader than the patent ultimately issued. The first prong of the "actual controversy" inquiry for a patent claim is not satisfied by threats of litigation of any kind between the parties, but by threats creating "a reasonable apprehension on the part of the declaratory plaintiff that it will face an *infringement* suit.' " *Id.* (quoting *Cygnus Therapeutics Sys.,* 92 F.3d at 1159) (emphasis added); *accord Quadlux, Inc.,* 172 F.3d at 855. Dethmers has studiously avoided asserting that any current product made by Automatic infringes the '851 patent; indeed, Dethmers has repeatedly maintained in this litigation that the only product made by Automatic that could have infringed the '851 patent, the AVENTA tow bar, is no longer in production. Although Automatic asserts that Dethmers's non-patent claims are an attempt to obtain patent-like protection three years or more prior to issuance of the patent, Automatic's argument seeks to strip away all trade secret protection—common-law and statutory—prior to issuance of a patent, as well as excuse overreaching or trickery in negotiations concerning use or licensing of unpatented inventions. Patent law preemption clearly does not reach so far.

Automatic also points to evidence, in the form of testimony of Jay Hesse, that Dethmers's representatives have told Automatic's customers that Automatic will be put out of business by this litigation. However, even according to Hesse's testimony, such comments occurred from about 1994 until about July of 1996, before the '851 patent was issued, and thus cannot constitute a threat to pursue an action for infringement of the '851 patent. *Cf. GAF Building Materials Corp.,* 90 F.3d at 482. Furthermore, these comments *to customers* do not resemble the explicit warnings of intention and ability to enforce patent rights made *to the alleged infringer* found in *Dainippon Screen Mfg. Co., Ltd.,* 142 F.3d at 1268.

Finally, Automatic relies on a "threatening" letter from Parent's Canadian attorney, App. IV, Tab 6. That letter, dated March 11, 1994, from Douglas B. Thompson, states that "I cannot help but feel that Mr. Parent was duped into signing the documents [executed by Parent and Bachman disclosing an invention for a self-aligning tow bar with a swivel joint invented by Parent in combination with a locking mechanism invented by Bachman] without fully appreciating their legal significance," and that "[w]e will communicate with you further when Mr. Parent's patent issues." However, the first "threat," or reference to misconduct by Automatic does not suggest a claim for infringement, but a claim of overreaching or trickery. As to the reference to the forthcoming Parent patent, this evidence again suffers from the defect that it is a threat that antedates issuance of the patent by some *four years, GAF Building Materials Corp.,* 90 F.3d at 482, and it is not from the assignee of the patent as issued, such that it does not constitute conduct of the *patentholder* indicating any basis for a present apprehension of an infringement suit. *Hunter Douglas, Inc.,* 153 F.3d at 1326 (the first prong requires "an explicit threat or other action by the patentee").

Thus, Automatic has failed to satisfy the first prong of the inquiry concerning subject matter jurisdiction over its declaratory judgment counterclaim regarding the '851 patent.

**ii. Present activity of the alleged infringer.** Even supposing that Automatic had satisfied the first prong of the "actual controversy" inquiry, it has not satisfied the second—the prong considering whether there is "present activity [of the alleged infringer] which could constitute infringement or concrete steps taken with the intent to conduct such activity." *Quadlux, Inc.*, 172 F.3d at 855. Dethmers contends that Automatic is not currently engaged in making any products that infringe the '851 patent. Automatic contends, however, that it is or may be engaged in potentially infringing activity, because from time to time it repairs AVENTA tow bars, and such repairs may rise to the level of "re-manufacturing" or "reconstruction" that constitutes infringement. Automatic also argues that its customers' continued "use" of AVENTA tow bars, which are rugged and long-lived products, may also constitute infringement, resulting in possible claims back against Automatic by customers Dethmers may charge with infringing Dethmers's patents.

As to this prong of the inquiry, the Federal Circuit Court of Appeals has explained, "The residual possibility of a future infringement suit based on [the alleged infringer's] future acts is simply too speculative a basis for jurisdiction over [the alleged infringer's] counterclaim for declaratory judgments of invalidity." *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1060 (Fed.Cir.1995), *cert. denied*, 516 U.S. 1093, 116 S.Ct. 815, 133 L.Ed.2d 760 (1996); *cf. Quadlux, Inc.*, 172 F.3d at 855 ("an actual controversy cannot be based on a fear of litigation over future products"). Thus, speculation that Automatic *might* repair AVENTA tow bars and that such repairs *might* rise to the level of infringing "re-manufacturing" or "reconstruction" simply is "too

speculative a basis for jurisdiction over [Automatic's] counterclaim for declaratory judgmen[t] of invalidity." *Id.* Likewise, Automatic's assertions that it might reintroduce the AVENTA tow bar into the market in the future are insufficient for two reasons: First, under *Quadlux*, 172 F.3d at 855, a declaratory plaintiff cannot assert a reasonable apprehension of being sued with regard to products "in the pipeline," but not yet advertised, manufactured, marketed, or sold, because "an actual controversy cannot be based on a fear of litigation over future products"; and, second, Automatic has presented no evidence of any "'concrete steps taken with the intent to conduct such activity,'" *see id.* (quoting *BP Chems. Ltd.*, 4 F.3d at 978, for this alternative for the second prong of the actual controversy inquiry). Finally, an assertion that Automatic's customers *might* be the target of "use" infringement suits and Automatic *might* then be subject to claims from its customers is also entirely speculative. *Cf. Quadlux, Inc.*, 172 F.3d at 855; *Super Sack Mfg. Corp.*, 57 F.3d at 1060. The record includes no evidence that Dethmers is contemplating or pursuing such "use" infringement suits. Indeed, at oral arguments, counsel for Dethmers represented that Dethmers would not be instituting such suits against Automatic's customers.

Thus, Automatic has also failed to satisfy the second prong of the "actual controversy" inquiry, such that this court does not have subject matter jurisdiction over Automatic's declaratory judgment counterclaim regarding the '851 patent.

**2. Summary**

The court concludes that it does not have subject matter jurisdiction over Count V of Automatic's counterclaim concerning non-infringement, unenforceability, and invalidity of the '851 patent, because Automatic has failed to establish either prong of the "actual controversy" requirement for such a claim. *Quadlux, Inc.*, 172 F.3d at 855. There is no actual

controversy extant at this time. *See id.* Thus, Dethmers's motion to dismiss Automatic's counterclaim regarding the '851 patent must be granted. Because the court does not have subject matter jurisdiction over Automatic's counterclaim, the court cannot properly reach Automatic's motion for summary judgment asserting that the '851 patent is invalid under 35 U.S.C. § 102(b), because the invention was "on sale" and in "public use" more than one year prior to the filing date of the application for the '851 patent. Consequently, Automatic's motion for summary judgment will be denied for lack of subject matter jurisdiction and Count V of Automatic's counterclaim will be dismissed.

### B. The '166 Patent Revisited

The court turns next to Dethmers's request that the court revisit its conclusions, found in its ruling on the first round of dispositive motions, that genuine issues of material fact preclude summary judgment as to "equivalents" infringement by Dethmers of Automatic's '166 patent. *See Dethmers*, 23 F.Supp.2d at 1038 & 1039–40.[6] In its June 16, 1999, motion for summary judgment, Dethmers argues that it is entitled to summary judgment on both its claim of non-infringement and Automatic's claim of infringement of the '166 patent on the ground that Automatic's claim of infringement is barred by prosecution history estoppel in light of recent decisions of the Federal Circuit Court of Appeals.

### 1. Contentions of the parties

Although this court previously found genuine issues of material fact as to the applicability of prosecution history estoppel to "equivalents" infringement of the "groove" and "spring location" limitations of the '166 patent, Dethmers points to more recent decisions of the Federal Circuit Court of Appeals "clarifying" that whether prosecution history estoppel applies is a question of law. Dethmers contends that the record on prosecution history estoppel is complete and that there is no reason to ask the jury to make any factual determinations, because Automatic has no chance of satisfying the legal requirements for overcoming prosecution history estoppel. Somewhat more specifically, Dethmers contends that Automatic amended its patent claims in a manner that responded to rejection of the claim based on prior art, and thus prosecution history estoppel applies. In the alternative, Dethmers argues that Automatic has failed to overcome the *"Warner–Jenkinson* presumption" that Automatic made the amendments in question in response to prior art rejection, and thus prosecution history estoppel applies. Automatic argues that prosecution history estoppel is not applicable to the particular amendments in question, because neither amendment was made in response to prior art, but only voluntarily to clarify the claims of the '166 patent.

### 2. Prosecution history estoppel

Even prior to the decisions upon which Dethmers relies, it was clear that the applicability of prosecution history estoppel is a question of law, and this court's prior

---

**6.** In the prior ruling, the court also concluded that Dethmers's accused devices do not literally infringe the elements of the '166 patent at issue here. *See Dethmers*, 23 F.Supp.2d at 1037 & 1039. Thus, if the accused devices infringe the patent at all, it must be under the doctrine of equivalents. Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner–Jenkinson Co. v.*

*Hilton Davis Chem. Co.*, 520 U.S. 17, 21, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). Whether an element of the accused device is equivalent to a claim limitation depends on "whether the substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element." *Id.* at 40, 117 S.Ct. 1040. The doctrine of equivalents was discussed in more detail in this court's ruling on the prior round of dispositive motions. *See Dethmers Mfg. Co., Inc.*, 23 F.Supp.2d at 1034–35.

ruling finding underlying genuine issues of material fact concerning the reasons for the amendments in question suggested nothing different. Rather, even on this question of law, the record before the court at the time a party raises the issue may not be sufficiently well developed to permit the necessary legal determinations, because the determination must be made in light of the prosecution history and the totality of the circumstances. *See, e.g., Loral Fairchild Corp. v. Sony Corp.,* 181 F.3d 1313, 1327 (Fed.Cir.1999).[7] Similarly, because the applicability of prosecution history estoppel in this case depends upon underlying facts, only if this court finds that the record is now sufficiently well developed will the court be able to answer the question of law of the applicability of prosecution history estoppel; Dethmers's mere assertion of the issue does not force the court to make that determination at this time.

### a. The nature of prosecution history estoppel

Prosecution history estoppel, as the Federal Circuit Court of Appeals recently explained, is a limitation on the scope of infringement under the "doctrine of equivalents":

> In *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997), the Supreme Court endorsed the continued vitality of the doctrine of equivalents. Because the doctrine of equivalents "has taken on a life of its own, unbounded by

the patent claims," the Court held that the doctrine must be applied as an objective inquiry on an element-by-element basis. *Id.* at 28–29, 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146. More importantly to this case, the Court affirmed that prosecution history estoppel continues to be a defense to infringement. *Id.* at 40, 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 ("Prosecution history estoppel continues to be available as a defense to infringement ...").

*The touchstone of prosecution history estoppel is that a patentee is unable to reclaim through the doctrine of equivalents what was surrendered or disclaimed in order to obtain the patent. Warner–Jenkinson,* 520 U.S. at 30, 117 S.Ct. 1040; *see also Cybor Corp. v. FAS Tech. Inc.,* 138 F.3d 1448, 1460, 46 USPQ2d 1169, 1178 (Fed.Cir.1998) (*in banc*); *Hughes Aircraft Co. v. United States,* 140 F.3d 1470, 1476, 46 USPQ2d 1285, 1290 (Fed.Cir.1998); *Litton Systems, Inc. v. Honeywell, Inc.,* 140 F.3d 1449, 1456, 46 USPQ2d 1321, 1325 (Fed. Cir.1998); *Pall Corp. v. Micron Separations, Inc.,* 66 F.3d 1211, 1219, 36 USPQ2d 1225, 1231 (Fed.Cir.1995), *cert. denied,* 520 U.S. 1115, 117 S.Ct. 1243, 137 L.Ed.2d 326 (1997).

Prosecution history estoppel applies to matter surrendered as a result of amendments to overcome patentability rejections, *see Warner–Jenkinson,* 520 U.S. at 30–31, 117 S.Ct. 1040; *Cybor,* 138 F.3d at 1460, 46 USPQ2d at 1178,

---

**7.** A panel of the Federal Circuit Court of Appeals recently held specifically that the record before it was not sufficient to resolve the question of the applicability of prosecution history estoppel. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 172 F.3d 1361, 1380 (Fed.Cir.1999). In *Festo,* the appellate court found that the "prosecution history raise[d] an unresolved issue" concerning one element of the patent in question, and the applicant's reference to performance of a certain function of the element in a letter accompanying the amendment "raise[d] the issue of whether this amendment was made for reasons of patentability, or whether the *Warner–Jenkinson* presumption arises and can, or

cannot, be rebutted." *Id.* Therefore, the court concluded that "the record [was] insufficient for appellate determination ab initio," forcing the court to remand the question of prosecution history estoppel and the *Warner–Jenkinson* presumption to the district court. *Id.* However, the panel decision has now been vacated and the appeal has been set for rehearing *en banc. See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 187 F.3d 1381 (Fed.Cir.1999). It is not clear whether the *en banc* court will address the question of whether the record is sufficient to resolve the matter. *See id.* at 1381–82 (listing the questions to be addressed on rehearing *en banc*).

and as a result of argument to secure allowance of a claim. *See, e.g., Wang Lab., Inc. v. Mitsubishi Elec., Inc.,* 103 F.3d 1571, 1578, 41 USPQ2d 1263, 1269 (Fed.Cir.1997); *Hoganas AB v. Dresser Indus., Inc.,* 9 F.3d 948, 952, 28 USPQ2d 1936, 1939 (Fed.Cir.1993); *Texas Instruments Inc. v. United States Int'l Trade Comm'n,* 988 F.2d 1165, 1174–75, 26 USPQ2d 1018, 1025 (Fed.Cir.1993). *Loral Fairchild Corp. v. Sony Corp.,* 181 F.3d 1313, 1322 (Fed.Cir.1999) (emphasis added); *Pall Corp. v. Hemasure, Inc.,* 181 F.3d 1305, 1310 (Fed.Cir.1999) ("Prosecution history estoppel bars a patentee from imposing liability for infringement by an otherwise equivalent device or method, when the claim scope that would have reached the accused device or method was relinquished by the patentee in order to avoid the prior art."); *Augustine Med., Inc. v. Gaymar Indus., Inc.,* 181 F.3d 1291, 1297–98 (Fed.Cir.1999) (prosecution history estoppel, like the "all elements" rule, is a limitation on undue expansion of the doctrine of equivalents that "prevents a patentee from recapturing subject matter surrendered during prosecution of the patent"); *Sextant Avionique, S.A. v. Analog Devices, Inc.,* 172 F.3d 817, 826 (Fed. Cir.1999); *Pharmacia & Upjohn Co. v. Mylan Pharmaceuticals, Inc.,* 170 F.3d 1373, 1376 (Fed.Cir.1999). As noted above, "[p]rosecution history estoppel is a legal question subject to *de novo* review on appeal." *Id.* at 1323; *Pall Corp.,* 181 F.3d at 1311; *Augustine Med., Inc.,* 181 F.3d at 1297–98.

■ Prosecution history estoppel arises from amendments that were *required* to be made for reasons of "patentability." *Warner–Jenkinson,* 520 U.S. at 30–31, 117 S.Ct. 1040; *Loral Fairchild Corp.,* 181 F.3d at 1321. The Federal Circuit Court of Appeals has concluded that the meaning of the word "patentability," from its context in *Warner–Jenkinson,* means "patentability over prior art." *Bai v. L & L Wings, Inc.,* 160 F.3d 1350, 1355 (Fed.Cir.1998). However, the specific question of whether amendments related to "patentability" is limited to those amendments made to overcome prior art under §§ 102 and 103, or any reason affecting the issuance of a patent, is now before the Federal Circuit Court of Appeals for *en banc* determination. *See Festo Corp.,* 187 F.3d at 1381–82. For now, this court will follow the narrower construction of "patentability" adopted by a panel of the Federal Circuit Court of Appeals in *Bai,* that is, that "patentability" means "patentability over prior art." *See Bai,* 160 F.3d at 1355; *accord Pall Corp.,* 181 F.3d at 1310–11 ("Prosecution history estoppel bars a patentee from imposing liability for infringement by an otherwise equivalent device or method, when the claim scope that would have reached the accused device or method was relinquished by the patentee *in order to avoid the prior art.*") (emphasis added).

In addition to arising from surrender of subject matter as a result of amendments to overcome patentability rejections, and as a result of argument to secure allowance of a claim, *see Loral Fairchild Corp.,* 181 F.3d at 1321, prosecution history estoppel is generated when a claim limitation is added in order to overcome a specific reference by the submission of new claims containing the limitation. *Pall Corp.,* 181 F.3d at 1311; *see also Pharmacia & Upjohn Co.,* 170 F.3d at 1376–77 (identifying some of the activities giving rise to prosecution history estoppel, and citing cases). Furthermore, "[f]or an estoppel to apply, the assertions in favor of patentability must 'evince a clear and unmistakable surrender of subject matter,' . . . not an 'equivocal' one." *Pharmacia & Upjohn Co.,* 170 F.3d at 1377 (citations omitted).

As to determining the scope of the estoppel, prior art may be of some aid, although it is not dispositive, but the ultimate test is an objective one: "whether a competitor would reasonably conclude that an applicant's prosecution conduct had surrendered the disputed subject matter." *Augustine Med., Inc.,* 181 F.3d at 1298–99 (citing *Cybor,* 138 F.3d at 1457); *Sextant*

*Avionique, S.A.,* 172 F.3d at 826–27 ("The scope of estoppel, *i.e.,* what subject matter has been surrendered during prosecution by the patentee, is to be viewed from the vantage point of a reasonable competitor of the patentee, .... and is determined with reference to the prior art and any amendments and/or arguments made in an attempt to distinguish such art.") (citations omitted); *Pharmacia & Upjohn Co.,* 170 F.3d at 1377 (same test). "[T]he entire record must be analyzed using [this] objective standard to determine what has been surrendered during prosecution." *Loral Fairchild Corp.,* 181 F.3d at 1326–27.

### b. The Warner–Jenkinson presumption

■ Although prosecution history estoppel arises from amendments that were *required* to be made for reasons of patentability, "[w]here the reason for the change was not related to avoiding the prior art, the change may introduce a new element, but it does not necessarily preclude infringement by equivalents of that element." *Warner–Jenkinson,* 520 U.S. at 33, 117 S.Ct. 1040. On the other hand, if examination of the reason for the change " 'indicates that a patent applicant has made a substantive change to his claim that clearly responds to an examiner's rejection of that claim as unpatentable over prior art, prosecution history estoppel applies to that claim; only the question of the scope of the estoppel remains.' " *Sextant Avionique, S.A.,* 172 F.3d at 826 (quoting *Bai,* 160 F.3d at 1355). Indeed, in the latter circumstance, " '[n]o presumption needs to be applied ... because the reason for the amendment is clear.' " *Id.* (again quoting *Bai,* 160 F.3d at 1355).

■ The Supreme Court explained in *Warner–Jenkinson* that in the gray area between changes clearly made for reasons other than patentability over prior art and changes clearly responding to an examiner's rejection of a claim as unpatentable over prior art, a new presumption arises: When it is not clear from the prosecution record why an amendment was made, there is a presumption that the amend-ment was made for reasons of patentability. *Warner–Jenkinson,* 520 U.S. at 33, 117 S.Ct. 1040. The Federal Circuit Court of Appeals recently explained the *Warner–Jenkinson* presumption in more detail as follows:

> In its analysis of prosecution history estoppel, the Supreme Court in *Warner–Jenkinson* articulated a rebuttable presumption that arises whenever an amendment to a claim is made but the reason for that amendment is not shown by the patentee.

> > Mindful that claims do indeed serve both a definitional and a notice function, we think the better rule is to place the burden on the patent-holder to establish the reason for an amendment required during patent prosecution. The court then would decide whether that reason is sufficient to overcome prosecution history estoppel as a bar to application of the doctrine of equivalents to the element added by that amendment. Where no explanation is established, however, the court should presume that the PTO had a substantial reason related to patentability for including the limiting element added by amendment. In those circumstances, prosecution history estoppel would bar the application of the doctrine [sic, of] equivalents.

> 520 U.S. at 33, 117 S.Ct. at 1040.

*Loral Fairchild Corp.,* 181 F.3d at 1322–23.

Therefore, there are three potential circumstances: (1) "[i]f the claims were amended for a reason 'related to patentability,' prosecution history estoppel applies"; (2) "if the claims were amended for a reason that was not 'related to patentability,' prosecution history estoppel does not apply absent a 'clear and unmistakable surrender' of certain subject matter"; and (3) "if the patent prosecution record does not disclose the reason for an amendment, a court must presume that the amendment

was made for purposes of patentability and that prosecution history estoppel applies, and provide the patentee with an opportunity to rebut that presumption." *Sextant Avionique, S.A.*, 172 F.3d at 828 (citing *Warner–Jenkinson*, 520 U.S. at 29–35, 117 S.Ct. 1040); *see also Warner–Jenkinson*, 520 U.S. at 33, 117 S.Ct. 1040 (the presumption of estoppel is "subject to rebuttal if an appropriate reason for a required amendment is established," and the burden is on the patentee to show the reason).

To determine whether the *Warner–Jenkinson* presumption arises, the court "must examine the reasoning behind the amendment to determine if it was made for purposes of patentability." *Loral Fairchild Corp.*, 181 F.3d at 1324 (citing *Warner–Jenkinson*, 520 U.S. at 33 & n. 7, 117 S.Ct. 1040). In examining the reasoning for an amendment, "[a]n applicant may not avoid the conclusion that an amendment was made in response to prior art by discussing the amendment under the rubric of a clarification due to a § 112 indefiniteness rejection[, because] [i]f that were permitted amendments made in response to a § 102 [anticipation] or § 103 [obviousness] rejection would tend to be disguised as responding to the § 112 rejection in an attempt to avoid the creation of prosecution history estoppel." *Id.; Sextant Avionique, S.A.*, 172 F.3d at 829–30; *Bai*, 160 F.3d at 1355 (also rejecting assertions that language in an amendment stating that a claim was being amended to "specifically and expressly recite the structural details" of the invention was "unpersuasive" to rebut the *Warner–Jenkinson* presumption, because "[t]here is no evidence, and Bai does not argue that there is such evidence, that clarity was a problem with his claims. There was no lack of clarity, and no rejection under Section 112. Prior art was the problem.").

Likewise, the Federal Circuit Court of Appeals has found it unavailing for the patentee to argue that the amendment could not have been made to overcome prior art, because it was not necessary to overcome the prior art rejection. *See Bai*, 160 F.3d at 1356. The court explained:

> It is now too late in the game for us to analyze whether Bai's addition of the term "hemispherical" was necessary to gain allowance of his claim. When an applicant disagrees with the examiner's prior art rejection and fails to prevail by argument, he has two choices: either to amend the claim or to appeal the rejection. He may not both make the amendment and then challenge its necessity in a subsequent infringement action on the allowed claim. Bai made his choice and amended the claim.... A patentee does not have a second chance to relitigate the merits of a prior art rejection that caused an amendment to be made to gain allowance of the claims. We therefore refuse to speculate as to whether the examiner would have found claim 1 to be allowable over the prior art if Bai had not added the term "hemispherical" to the claim. Whether or not the "hemispherical" limitation was superfluous, the prosecution record clearly reveals that Bai made this amendment to overcome prior art.

*Bai*, 160 F.3d at 1356 (internal citations omitted).

When prosecution history estoppel applies pursuant to an unrebutted *Warner–Jenkinson* presumption, the scope of the resulting estoppel is clear: "In those circumstances, prosecution history estoppel would bar the application of the doctrine of equivalents as to that element." *Warner–Jenkinson*, 520 U.S. at 33, 117 S.Ct. 1040; *Sextant Avionique, S.A.*, 172 F.3d at 831 ("Finding the Supreme Court's language clear, we hold that in circumstances in which the *Warner–Jenkinson* presumption is applicable, *i.e.*, where the reason for an amendment is unclear from an analysis of the prosecution history record, and unrebutted by the patentee, the prosecution history estoppel arising therefrom is total and completely 'bars' the application of the doctrine of equivalents as to the amended limitation."). The Federal Circuit Court of

Appeals has reasoned that this is so, because of the difficulties of determining the scope of estoppel arising from an unrebutted *Warner–Jenkinson* presumption: In the circumstances in which the presumption applies, it is unlikely that the prior art or the patentee's arguments will be of assistance in determining the scope of the estoppel. *See Sextant Avionique, S.A.,* 172 F.3d at 832.

### 3. Prosecution history estoppel here

Again, Dethmers's assertion of prosecution history estoppel focuses on two elements of claim 1 of the '166 patent, the "groove circularly surrounding" the inner tube of each telescoping arm and the location of the helical spring in the latch mechanism. The court will consider the applicability of prosecution history estoppel to each element by first looking to see if the reasons for the amendments are "clear" from the prosecution history, and if they are not, by considering the applicability of the *Warner–Jenkinson* presumption.

#### a. Prosecution history

When filed on July 12, 1993, the original application for what became the '166 patent stated the pertinent elements of claim 1 as follows:

What Is Claimed Is As Follows:

1. Arrestably Lockable Telescoping Tow–Bar Assembly comprising:

(A) an inner-tube having an outer-surface concentrically surrounding a directionally longitudinally extending central-Axis and having a trail-end directionally transversely intersecting said central-axis, said outer-surface being privided [sic] with at least one radially inwardly extending indentation arrayed about said central-axis and located in a plane directionally transverse to said central-axis;

\*    \*    \*    \*    \*    \*

(E) spring means actuatably extending directionally longitudinal between the cover member and the slidable latch member.

*See* Plaintiff's Statement of Uncontested Facts, Tab N, Bates Stamp Nos. 000611–000612; Defendant's App. IV, Tab 16.

In the Examiner's Action filed November 15, 1993, the examiner rejected all five claims of the application. *See* Plaintiff's Statement of Uncontested Facts, Tab N, Bates Stamp No. 000624; Defendant's App. IV, Tab 17.[8] Claims 1 through 5 were rejected for various unnecessary hyphens, improper capitalizations, and typographical errors. *Id.* at 000626–000627. The examiner also stated more substantive grounds for rejection of claim 1. First, claims 1 through 5 were rejected under 35 U.S.C. § 112 "as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention." *Id.* at 000627, ¶ 6. Claims 1 through 4 were also rejected under 35 U.S.C. § 103 (obviousness) "as being unpatentable over Davis in view of Nikitenko":

Davis discloses the claimed invention except for the quick release joint disclosed by the applicant.

It is well known in the art to provide a quick release lock for telescoping tubular members so that the two telescoping members can quickly and easily be locked or free to move axially in relation to one another. One such quick release apparatus is disclosed by Nikitenko and comprises an inner tube 1 with an annular indentation 2 around its periphery, an outer tube 4 having an inner surface surrounding said inner tube, said outer tube being provided with a number of side openings, each said side openings [sic] being provided with a spherical ball whose diameter slightly exceeds the radial dimension between the outer tube outer surface and its inner surface, a

---

**8.** Because the portions of the prosecution history are Bates Stamped in Plaintiff's Statement of Uncontested Facts, the court will rely on that exhibit when specific pages must be cited.

slideable latch member 5 permanently surrounding said outer tube ball openings and including a medially located cam portion slidably surrounding the outer tube outer surface, a helical spring biasing said slidable latch in a longitudinal direction, and said outer tube inward surface including a trailing surface portion that is spaced radially outward away from the inner tube outer surface and wherein the inner tube at a trailing end thereof is provided with a flange means extending radially outwardly from the inner tube outer surface pro-

viding a safety means between the telescoping inner and outer tubes.

It would have been obvious to one of ordinary skill in the art to modify Davis by adding the quick release coupling disclosed by Nikitenko to more easily and quickly lock the telescoping tubes together.

*Id.* at 000628–000629.

The Nikitenko reference relied upon by the examiner is a Soviet patent, in Russian, but including the following illustration and abstract in English:

NIKI/          F4369X/24 *SU 482-551

Door bolt - spring loaded sleeve containing shaft and tube with spheres simplifies assembly

NIKITENKO L I   03.05.77-SU-779662

O47 (03.12.75) E051-05/14

Shaft (1) with a recess (2) and spheres (3) is located inside a tube (4) which has openings for the spheres. A springloaded sleeve (6) is put over the assembly for dismantling the sleeve is pulled to the right. the spheres fall in the space (7) of the sleeve and allow the shaft to be pulled out. Assembly is automatic due to the spring. 3. 5. 77. as 779662 (2pp) NIKITENKO L. I. BABENKO I. P. MURZINA K. A. Bul. 32/30.8.75.

*Id.* at 000633; Defendant's App. IV, Tab 18.

In response to the Examiner's Action of November 15, 1993, Automatic's patent attorney requested a copy of the Nikitenko reference. *Id.* at 00063. He received a copy of the reference in a supplemental Examiner's Action dated December 2, 1993. In response to that office action and the action of November 15, 1993, Automatic provided the following amended versions of the pertinent claims, with deletions shown in brackets and additions underlined:

What Is Claimed Is As Follows:

1. Arrestably Lockable Telescoping Tow–Bar Assembly comprising:

(A) an inner-tube having an outer-surface concentrically surrounding a directionally longitudinally extending central-Axis and having a trail-end directionally transversely intersecting said central-axis, said outer-surface being provided with at least one radially inwardly extending [indentation arrayed about] *inward-groove circularly surrounding* said central-axis and located in

a plane [directionally transverse] *perpendicular* to said central-axis;

\* \* \* \* \* \*

(E) *helical* spring means *surronding {sic, with handwritten correction "surrounding"} the outer-tube and* actuatably extending directionally longitudinal between the cover member and the slidable latch member *medially located cam portion.*

*See Id.* at 000637; Defendant's App. IV, Tab 14. With the amendment, Automatic provided the following "Remarks":

> The claims were rejected in paper no. 2 [the Examiner's Action of November 15, 1993], under 35 USCode 103, as being unpatentable over *Davis* (USPatent 4856805) and in view of *Nikitenko* (Soviet Patent 482551) in the Russian language. At the outset, it is noted from said *Davis* citation, from *Duncan* (USPatent 5224960), from *Duncan* (USPatent 5071153), from *Milner* (USPatent 4013303), from *Brownleewe* (USPatent 3147027), from *Morehouse* (USPatent 3419285), from *Johnson* (USPatent 4869521), and from *Johnson* (USPatent 5000473), that this is a crowded-art, but they all lack the features shown in subparagraphs (C), (D), and (E) of applicants' Claim 1(Amended). Examiners rely upon Soviet Patent 482551 (*Nitotenko*) in the Russian language and apparently drawn from non-analogous arts to make a 35 USCode 103 rejection. Moreover, in paper no. 4, the Examiner provided applicants with only 1–page (in the Russian language) of *Nikitenko.* The Examiners know that foreign reference citations (particularly in non-English form) are to be strictly construed in favor of patentability.
>
> Accordingly, in view of the foregoing amendments and remarks, it is respectfully urged that this application is now in condition for a "Notice of Allowance and Issue Fee Due" (and conditioned therein upon applicants' compliance with PTO FORM 948 that was appended to paper no. 2).

*Id.* at 000639 (with emphasis, spellings, and citation forms as in the original).

Plainly, the pertinent parts of the original '166 patent application were rejected on "patentability" grounds, that is, "patentability over prior art." *See Bai,* 160 F.3d at 1355 (defining "patentability" for purposes of prosecution history estoppel, in light of *Warner–Jenkinson,* as "patentability over prior art"); *see also Loral Fairchild Corp.,* 181 F.3d at 1322–23 ("prosecution history estoppel applies to matter surrendered as a result of amendments to overcome patentability rejections...."); *Pall Corp.,* 181 F.3d at 1310–11 ("Prosecution history estoppel bars a patentee from imposing liability for infringement by an otherwise equivalent device or method, when the claim scope that would have reached the accused device or method was relinquished by the patentee *in order to avoid the prior art.*") (emphasis added). In the examiner's action of November 15, 1993, the examiner specifically found that claim 1, which includes the pertinent limitations, was rejected under 35 U.S.C. § 103 (obviousness) "as being unpatentable over Davis in view of Nikitenko." Plaintiff's Statement of Uncontested Facts, Tab N, Bates Stamp No. 000628. Still more specifically, the examiner found that "[i]t would have been obvious to one of ordinary skill in the art to modify Davis by adding the quick release coupling disclosed by Nikitenko to more easily and quickly lock the telescoping tubes together." *Id.* at 000629. The examiner found that the "quick release apparatus" disclosed by Nikitenko was in part comprised of *what the examiner described* as "an inner tube 1 with an annular indentation 2 around its periphery," and "a slideable latch member ... including a medially located cam portion [with] a helical spring biasing said slidable latch in a longitudinal direction." *Id.* at 00628–000629. The examiner clearly thought the Nikitenko patent made "obvious" claim 1 of the '166 patent application, which included "one radially inwardly extending

indentation arrayed about said central-axis" of the inner tube and the "spring means actuatably extending directionally longitudinal between the cover member and the slidable latch member." *Id.* at 000627–000638 (language of the original application). However, the examiner *also* rejected the pertinent claim of the application on § 112 grounds "as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention." *Id.* at 000627, ¶ 6; *and compare Bai,* 160 F.3d at 1355 ("[t]here is no evidence . . . that clarity was a problem with [Bai's] claims. There was no lack of clarity, and no rejection under Section 112. Prior art was the problem."). Thus, the question is whether the prosecution history clearly indicates which amendments were made in response to "indefiniteness" rejections, and which were made in response to "obviousness" rejections.

Answering that question requires the court to examine closely the amendments made and Automatic's patent attorney's "Remarks" asserting the adequacy of the amendments to overcome the rejections. *See Loral Fairchild Corp.,* 181 F.3d at 1322 (prosecution history estoppel arises from surrender of subject matter as a result of amendments to overcome patentability rejections, and as a result of argument to secure allowance of a claim); *Pall Corp.,* 181 F.3d at 1311 (prosecution history estoppel is generated when a claim limitation is added in order to overcome a specific reference by the submission of new claims containing the limitation); *see also Pharmacia & Upjohn Co.,* 170 F.3d at 1376–77 (identifying some of the activities giving rise to prosecution history estoppel, and citing cases). In his "Remarks," the patent attorney acknowledged that the examiner had rejected the pertinent claim on the ground of "obviousness" in light of the Davis and Nikitenko patents. *See* Plaintiff's Statement of Uncontested Facts, Tab N, Bates Stamp No. 000639. He then argued that none of the patents that he acknowledged formed part of the "crowd-

ed-art"—a group in which he did not place the Nikitenko patent—included the amended limitations found in subparagraphs (C), (D), and (E), the last of which is the "spring location" limitation. *Id.* However, he did *not* make such an assertion as to subparagraph (A), which includes the "groove circularly surrounding" limitation. *Id.* Thus, it does not appear that the patent attorney ever argued that the "circularly surrounding" limitation distinguished the claims of the '166 patent application from *any* of the prior art that comprised the "crowded-art." Therefore, there is at least a colorable argument that the "groove circularly surrounding" limitation was included *only* in response to the § 112 indefiniteness objection or simply to "clarify" the language of the claim describing the structure of the invention. At the same time, it is clear that the patent attorney was arguing that the "spring location" limitation in subparagraph (E) distinguished the application from the prior art he acknowledged formed part of the "crowded-art," because he specifically said so. What is less clear is whether the patent attorney was arguing that the amendments to either subparagraph (A) or subparagraph (E) distinguished the amended application from Nikitenko.

In response to the citation to the Nikitenko patent, Automatic's patent attorney argued that "[t]he Examiners know that foreign reference citations (particularly in non-English form) are to be strictly construed in favor of patentability." *Id.* If the English language explication of the Nikitenko patent, as opposed to the examiner's statement of the Nikitenko patent, is taken as such a "strict" construction, that explication refers not to any "groove circularly surrounding" the inner tube, the language of amended limitation (A), or to any "annular indentation around [the] periphery [of the inner tube]," the language used by the examiner in describing the Nikitenko patent, but to a "recess" in the "shaft." *See id.* at 000633. From the illustration of the Nikitenko patent, shown above at page 43,

it is unclear whether the "recess" is only a "pit" into each side of the "shaft," or a "groove" surrounding the shaft, although the parallel lines connecting the lips of the two recesses on the top and bottom of the shaft may suggest a continuous groove around the shaft. Thus, it is simply unclear from the prosecution history whether or not the patent attorney was arguing that the amendment to include a "groove circularly surrounding" the inner tube distinguished claim 1 of the '166 patent application from Nikitenko, because a "groove circularly surrounding" would distinguish the application from Nikitenko if Nikitenko is strictly construed to show only "recesses" that are simply "pits" in the shaft, but would not necessarily distinguish Nikitenko if the "recess" is construed to run completely around the shaft.

Similarly, although the English explication of the Nikitenko patent refers to a "springloaded sleeve" that is "put over the assembly," the specific kind of spring (helical spring surrounding the outer tube or some other kind of spring not surrounding the tube) is not apparent from either the English explication or the illustration of the Nikitenko patent. Furthermore, what is clear from the illustration of the Nikitenko patent, although not mentioned in the English explication, is that the spring, of whatever type, is not "between the cover member and the slidable latch member medially located cam portion," as specified in the amended claims of the '166 patent

application, but "between" the "sleeve" (at the left end of the spring in the illustration) and the stationary portion of the outer "tube" (at the right end of the spring in the illustration). In Nikitenko, the "cam portion" comprises part of the "sleeve," all of which is indicated as part (6) in the illustration. Automatic argues strenuously that the '166 patent application says nothing about which parts the spring "contacts" or "pushes against" in defining the spring location. Nonetheless, it is apparent that the moving part against which the spring pushes in the '166 patent application differs from the moving part against which the spring pushes in the Nikitenko patent. When the spring is compressed in the '166 patent application, it remains in contact with the "medially-located cam portion," and thus remains at all times "between" that "cam portion" and the "cover." However, when the spring in the Nikitenko patent is compressed, it is apparent that it is never in contact with the "cam portion," although it remains at all times "between" the "sleeve" and the stationary portion of the outer "tube." Thus, it is possible that the patent attorney was arguing that, when the Nikitenko patent was "strictly construed," the amendments to limitation (E) specifying a "helical" spring "surrounding the outer-tube" and located "between the cover member and the slidable latch member medially located cam portion" would distinguish the patent application from Nikitenko.[9]

---

9. For the sake of completeness, the court must consider whether amendments of limitations not presently at issue in this litigation nonetheless were the *only* amendments addressed to "patentability," while the amendments at issue, in contrast, were the ones clearly aimed at § 112 rejection. Otherwise, a certain myopic focus on the "groove" and "spring location" limitations that was not present at the time of prosecution of the patent could arise as the result of the importance of those limitations to the present litigation. The only other limitation of claim 1 of the application amended after the November 15, 1993, Examiner's Action was subparagraph (B). The amendments to subparagraph (B)

included additions, shown underlined, and deletions, shown in brackets, as follows:

(B) an outer-tube having a leadward-end directionally transversely intersecting said contral-axis and having [ (adjacent to said leadward-end) ] and outward-surface surrounding said central axis and an inward-surface slidably surrounding said inner-tube/outward-surface, said outer-tube being provided with a finite-plurality of *equiangularly-spaced side* ward-openings *therethrough* that are radially and directionally transversely alignable with said [inner-tube at least one outer-surface indentation] *inner-tube's outer-surface inward-groove,* each said [out] sideward-opening being provided with a spherical ball whose diameter slight-

Although the court has noted that certain amendments to the '166 patent application could colorably have been made on "definiteness" or "clarity" grounds, *nowhere in his "Remarks" or elsewhere in the proffered amendments did the patent attorney assert that any amendment had been made in response to the examiner's § 112 rejections.* See Plaintiff's Statement of Uncontested Facts, Tab N, Bates Stamp No. 000639; *see also supra* at pp. 967–68. The "Remarks" were instead directed entirely at the § 103 obviousness rejection. *Id.* The lack of argument in the "Remarks" for the amendments on "definiteness" grounds at the time the patent was prosecuted suggests that the amendments were *not* made on those grounds, but only on "obviousness" grounds. Conversely, the inclusion of arguments directed at overcoming an "obviousness" rejection strongly suggests that "obviousness" was the reason for the amendments.

Although the court is certain that the patent attorney was attempting to distinguish the application, as amended, from Nikitenko, when the Nikitenko patent was "strictly construed," such that some prosecution history estoppel must have arisen, *see, e.g., Loral Fairchild Corp.,* 181 F.3d at 1321 ("The touchstone of prosecution histo-

ry estoppel is that a patentee is unable to reclaim through the doctrine of equivalents what was surrendered or disclaimed in order to obtain that patent."), the court is unable to determine precisely what amendments were made to avoid that prior art, when "strictly construed," [10] or, more specifically, to determine from the prosecution history the reason for any particular amendment. There is certainly estoppel "in the air," but to what it sticks, this court simply cannot tell.

### b. Presumption and rebuttal

██ It is precisely when, as here, it is not clear from the prosecution record why an amendment was made that the *Warner–Jenkinson* presumption of estoppel arises. *See Warner–Jenkinson,* 520 U.S. at 33, 117 S.Ct. 1040; *Loral Fairchild Corp.,* 181 F.3d at 1322; *Sextant Avionique, S.A.,* 172 F.3d at 828. That presumption, again, is that that the amendment was made for reasons of patentability over prior art. *Warner–Jenkinson,* 520 U.S. at 33, 117 S.Ct. 1040. Because the presumption has arisen here, the court must "provide the patentee with an opportunity to rebut that presumption." *Sextant Avionique, S.A.,* 172 F.3d at 828 (citing *Warner–Jenkinson,* 520 U.S. at 33, 117 S.Ct. 1040); *accord Warner–Jenkinson,*

ly exceeds the radial dimension between the outer-tube outward-surface and inward-surface, and said outer-tube between a leadward-end *thereof* and said transversely aligned balls-provided sideward-openings being externally provided with a retainer ring that surrounds and extends directionally radially outwardly beyond said outer-tube outward-surface. *Id.* at 000638. Returning to the patent attorney's "Remarks," it appears, just as it did with subparagraph (A), that the patent attorney was not asserting that the amendment of subparagraph (B) distinguished the application from the "crowded-art," because subparagraph (B) is not listed as distinguishing that prior art. *Id.* at 000639. Thus, amendments to subparagraph (B) might only have been offered for reasons of "definiteness," or "clarity," not "patentability over prior art." Ultimately, the court concludes that neither hindsight nor "myopia" would suggest that the amendments to subparagraph (B) were the

only amendments in response to the November 15, 1993, Examiner's Action that were intended to distinguish a "strictly construed" reading of Nikitenko. Therefore, the amendments to subparagraph (B) do not alter the court's analysis of the reasoning behind the amendments to the limitations at issue here.

10. Even if the court acts upon its conclusion that some prosecution history estoppel must have arisen, neither recourse to the prior art, nor the ultimate "objective test" assists the court in determining the scope of the resulting estoppel. *See, e.g., Augustine Med., Inc.,* 181 F.3d at 1298 (referring the district court to the prior art to assist in the determination of the scope of prosecution history estoppel, but pointing out that the ultimate test is an "objective" one). The court cannot tell "whether a competitor would reasonably conclude that an applicant's prosecution conduct had surrendered the disputed subject matter." *Id.*

520 U.S. at 33, 117 S.Ct. 1040 (stating that the presumption of estoppel is "subject to rebuttal if an appropriate reason for a required amendment is established," and the burden is on the patentee to show the reason). Only when the presumption has arisen and the patentholder seeks to rebut it does the court find that it is proper to look beyond the prosecution record to the *post hoc* reasons proffered by the patent attorney· in his deposition.

Automatic relies on repeated assertions in the deposition testimony of the patent attorney who prosecuted the '166 patent application that the amendments in question here were to "clarify" the claims or to state the structural details of the patent more specifically. Automatic points particularly to his testimony that he believed the thrust of the examiner's objections were to the "language" of his claims. However, the Federal Circuit Court of Appeals rejects attempts to avoid prosecution history estoppel by asserting amendments "under the rubric of a clarification due to a § 112 indefiniteness rejection," because if that were permitted, amendments made in response to a § 102 (anticipation) rejection or a § 103 (obviousness) rejection—the latter of·which was present in the prosecution of this patent—"would tend to be disguised as responding to the § 112 rejection in an attempt to avoid the creation of prosecu-·tion history estoppel." *Loral Fairchild Corp.*, 181 F.3d at 1324; *Sextant Avionique, S.A.*, 172 F.3d at 829–30. As this court noted above, there was both a § 112 rejection and a § 103 rejection of the claim in question here in the prosecution history, providing some basis for latter-day assertions that the amendments in question were for "clarification" purposes. *Compare Bai*, 160 F.3d at 1355 (there was no rejection under § 112 rejection, such that arguments that amendments were to "specifically and expressly recite the structural details" of the invention were "unpersuasive"). However, as observed above, *nowhere in his "Remarks" or elsewhere in the proffered amendments did the patent attorney assert that any amendment had* been made in response to the examiner's § 112 rejections. See Plaintiff's Statement of Uncontested Facts, Tab N, Bates Stamp No. 000639; *see also supra* at p. 44. The "Remarks" were instead directed entirely at the § 103 obviousness rejection. *Id.* The lack of argument in the "Remarks" for the amendments on "definiteness" grounds at the time the patent was prosecuted suggests that the amendments were *not* made on those grounds, but only on "obviousness" grounds. Conversely, the inclusion of arguments directed at overcoming an "obviousness" rejection strongly suggests that "obviousness" was the reason for the amendments. Thus, Automatic has failed to overcome the presumption of prosecution history estoppel on this ground.

Likewise, Automatic's lengthy, careful, and generally persuasive arguments that the amendments do not distinguish the application from the Nikitenko patent, and thus could not have been made to overcome that prior art, are nonetheless unavailing in light of the decision of the Federal Circuit Court of Appeals in *Bai*, 160 F.3d at 1356. In this case, it is also "too late in the game" for this court to decide that the amendments were not necessary to gain allowance of claim 1 of the '166 patent. *Id.* Automatic's patent attorney was confronted with the examiner's conclusion that the '166 patent application was unpatentable over Nikitenko, and, although he clearly disagreed with that conclusion, he nonetheless did not stand on the argument that Nikitenko was not analogous or already distinguishable. Instead, as in *Bai*, he amended the claim, argued for "strict" construction of Nikitenko, and asserted that, in light of the amendments, the application should be accepted. *Compare id.* Although the court cannot say that it is as "clear" as it was in *Bai* that the specific amendments in question here were each made for the purpose of overcoming prior art, such that prosecution history estoppel would apply even without the *Warner–Jenkinson* presumption, *com-*

pare id., it is clear that Automatic has failed to overcome the presumption of estoppel on the ground that the amendments were superfluous to overcoming Nikitenko.

Finally, although reluctantly and somewhat equivocally, Automatic's patent attorney conceded that, as to the amendment of the "spring location" limitation, "I may have done it to avoid Nikitenko." Nimmer Deposition, p. 106, l. 2; and compare id. at pp. 103–105 (asserting that the Nikitenko device lacks characteristics of the spring and its location that appear in the amended claims of the '166 patent). Although there is no such specific concession as to the "groove circularly surrounding" limitation, see id. at pp. 81–88, the patent attorney's repeated assertions that he made that change to "clarify" the claims or in response to the § 112 rejection simply are unpersuasive in light of his equally frequent assertions that he does not remember the reason for the amendment and his inability to articulate in what way the amended language clarified the original language. See id. Those assertions are even less persuasive in the face of the complete lack of any argument in the "Remarks" accompanying the amendment going to any § 112 rejection and the focus of those "Remarks" on the § 103 rejection. See Plaintiff's Statement of Uncontested Facts, Tab N, Bates Stamp No. 000639. Thus, the patent attorney's deposition testimony does not rebut the Warner–Jenkinson presumption that the amendments in question were made for the purpose of patentability over prior art.

In light of an unrebutted Warner–Jenkinson presumption as to either of the two elements at issue here, the court must conclude that prosecution history estoppel bars the application of the doctrine of equivalents as to those elements. Warner–Jenkinson, 520 U.S. at 33, 117 S.Ct. 1040; Sextant Avionique, S.A., 172 F.3d at 831 (prosecution history estoppel arising from an unrebutted Warner–Jenkinson presumption "is total and completely 'bars' the application of the doctrine of equiva-

lents as to the amended limitation"). Therefore, Automatic cannot assert that Dethmers's accused devices, which do not literally infringe the '166 patent, see Dethmers, 23 F.Supp.2d at 1037 & 1039, nonetheless infringe that patent as to the limitations in question here under the doctrine of equivalents. Dethmers is therefore entitled to summary judgment on both its claim of non-infringement and Automatic's claim of infringement of the '166 patent.

### C. False Advertising

In its motion for summary judgment, Dethmers also challenges Count II of Automatic's counterclaim, which asserts a claim of "false advertising" under section 43 of the Lanham Act, 15 U.S.C. § 1125(a). The gravamen of the claim is that, in connection with its tow bar, Dethmers used in commerce false or misleading descriptions of fact and false or misleading representations of fact by stating that its tow bar contained a "patented flex joint" and by stating that Automatic was infringing Dethmers's patent rights. Answer to Third Supplemental Amended Complaint and Amended Counterclaim, Counterclaim, Count II, ¶ 10.

Dethmers argues that it is entitled to summary judgment on this counterclaim, because the claim is not a "false origin" claim, and thus does not fall under 15 U.S.C. § 1125(a)(1)(A). Dethmers also argues that Automatic will be unable to establish the elements of a claim under 15 U.S.C. § 1125(a)(1)(B) concerning misrepresentation of the nature, characteristics, qualities, or geographic origin of Dethmers's or Automatic's goods, because its statements concerning the "patented flex joint" were true, and those concerning Automatic's infringement were not made in commercial advertising or promotion, and were also true, because Automatic's products infringed the Re482 patent, even if that patent was actually invalid. Automatic argues that it will be able to establish, or can now generate genuine issues of material fact on, the elements of this claim. Although Automatic argues that Dethmers

has not denied making the statements concerning Automatic's infringement, Dethmers contends that there was nothing to deny, because Automatic has never identified what statements were made, where they were made, by whom they were supposedly made, or to whom. Furthermore, Dethmers contends that Automatic has failed to generate a genuine issue of material fact—or even assert—that Dethmers's representation of its patent coverage was in bad faith.

### 1. Which circuit's law applies?

■ Although the "false advertising" claim involves in part allegations of misrepresentation of patent coverage, this claim is not pursuant to any patent statute. Therefore, the court must first determine which circuit's law applies to Automatic's § 1125(a) claim. In its prior ruling in this case, this court noted that "[t]he Federal Circuit Court of Appeals has repeatedly held that if issues are not unique to its exclusive jurisdiction—such as appeals of patent law issues—it will defer to the law of the regional circuit in which the district court sits." *Dethmers Mfg. Co., Inc.,* 23 F.Supp.2d at 998 (citing cases so holding). The Federal Circuit Court of Appeals has made clear that "false advertising" claims under the Lanham Act, indeed claims under the Lanham Act in general, usually do not fall within the exclusive jurisdiction of the Federal Circuit Court of Appeals, but are instead reviewed in accordance with the law of the regional circuit within which the case arose. *See Continental Plastic Containers v. Owens Brockway Plastic Prods., Inc.,* 141 F.3d 1073, 1080 (Fed.Cir. 1998) ("trade dress" case observing that, "[i]n reviewing Lanham Act claims we look to the law of the regional circuit where the district court sits...."); *Imagineering, Inc. v. Van Klassens, Inc.,* 53 F.3d 1260, 1263 (Fed.Cir.) (a "trade dress" claim under § 43 of the Lanham Act must be reviewed under the law of the regional circuit), *cert. denied,* 516 U.S. 909, 116 S.Ct. 277, 133 L.Ed.2d 197 (1995); *KeyStone Retaining Wall Sys., Inc. v. Westrock,*

*Inc.,* 997 F.2d 1444, 1447 (Fed.Cir.1993) (a "false advertising" claim under § 43 of the Lanham Act must be reviewed under the law of the regional circuit).

That is not the end of the matter, however, in this case. Recently, in *Zenith Electronics Corporation v. Exec, Inc.,* 182 F.3d 1340 (Fed.Cir.1999), the Federal Circuit Court of Appeals held that where a § 43 "false advertising" claim was premised on alleged commercial statements that the claimant was infringing the advertiser's patent, the potential conflict between the Lanham Act and patent law was an "issue [that] impacts directly on the patent laws, implicating our area of exclusive jurisdiction, as the context involves statements as to the infringement and scope of patents. Accordingly, we decide the question as a matter of this circuit's law." *Zenith Elec. Corp.,* 182 F.3d at 1346. Thus, under *Zenith Electronics Corporation,* it is clear that the portion of Automatic's counterclaim of "false advertising" based on allegations that Dethmers told customers Automatic was infringing Dethmers's patents falls within the exclusive jurisdiction of the Federal Circuit Court of Appeals. *Id.* Furthermore, because Automatic's "false advertising" claim is also premised on allegedly false assertions by Dethmers that its tow bars contained a "patented flex joint," it is just as clear that this portion of the "false advertising" claim involves the "scope of [a] paten[t]," and thus also falls within the exclusive jurisdiction of the Federal Circuit Court of Appeals. *Id.* Therefore, this portion of the claim will also be considered according to standards established by the Federal Circuit Court of Appeals.

### 2. Summary judgment standards

Having concluded that the Federal Circuit Court of Appeals has jurisdiction over the particular Lanham Act "false advertising" claim at issue here, it follows that the standards for summary judgment on and the elements of that claim are governed by

Federal Circuit law. This court discussed the standards for summary judgment under Federal Circuit law in some detail in its prior ruling in this case. *See Dethmers Mfg. Co., Inc.,* 23 F.Supp.2d at 1011–14. The parties do not dispute those standards; thus, it is unnecessary to consider them again in detail here. Rather, suffice it to say that Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment in favor of either a claimant or a defendant on a claim if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See id.* at 1012 (citing FED. R. CIV. P. 56(a)-(c)); *Glaxo Group, Ltd. v. TorPharm, Inc.,* 153 F.3d 1366, 1370 (Fed.Cir.1998); *Transmatic, Inc. v. Gulton Indus., Inc.,* 53 F.3d 1270, 1274 (Fed.Cir.1995); *Comair Rotron, Inc. v. Nippon Densan Corp.,* 49 F.3d 1535, 1536 (Fed.Cir.1995)). The Supreme Court has established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.,* 45 F.3d 1550, 1560 (Fed.Cir.1995); *Continental Can Co. USA, Inc. v. Monsanto Co.,* 948 F.2d 1264, 1265 (Fed.Cir. 1991)). Rule 56 "is a vehicle for the convenience of the parties and courts, for use when the circumstances warrant; but is not a substitute for trial when decision of the controversy requires resolution of disputed factual issues." *Id.* (citing *Glaverbel,* 45 F.3d at 1560, in turn citing *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548)).

### 3. Elements of this "false advertising" claim

The statute upon which Automatic's "false advertising" claim relies provides, in pertinent part, as follows:

### § 1125. False designations of origin, false descriptions, and dilution forbidden

**(a) Civil Action**

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

> **(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> **(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a)(1). Although Dethmers moved for summary judgment on the ground that Automatic could not prevail on a claim under either subdivision (A) or subdivision (B) of this statute, it is apparent from Automatic's response that Automatic asserts only claims under subdivision (B). Paraphrasing the statute, Automatic claims that Dethmers's advertisements that its tow bar contains a "patented flex joint" fall within subdivision (B), because

> Dethmers is liable in a civil action by Automatic if Automatic believes that it is, or is likely to be, damaged by:

Dethmers, in connection with *Dethmers'* tow bars, using in commerce any word, term, or any combination thereof, or any false or misleading description of fact, or false or misleading representation of fact, which, in commercial advertising or promotion, misrepresents the nature, characteristics, or qualities of *Dethmers'* tow bars.

Automatic's Memorandum In Support Of Defendant's Resistance To Plaintiff's Second Motion For Summary Judgment (Automatic's Resistance Brief), p. 18. Likewise, again paraphrasing the statute, Automatic contends that Dethmers's statements to customers that Automatic was infringing its patents fall within § 1125(a)(1)(B), because

Dethmers is liable in a civil action by Automatic if Automatic believes that it is, or is likely to be, damaged by:

Dethmers, in connection with *Automatic's* tow bars, using in commerce any word, term, or any combination thereof, or any false or misleading description of fact, or false or misleading representation of fact, which, in commercial advertising or promotion, misrepresents the nature, characteristics, or qualities of *Automatic's* tow bars.

Automatic's Resistance Brief, pp. 20–21. Subdivision (a)(1)(B) of the statute does, by its plain terms, prohibit false or misleading descriptions or representations by any person that pertain to "his or her or another person's goods," so that such statements about either Dethmers's own goods or Automatic's goods could give rise to Automatic's action. 15 U.S.C. § 1125(a)(1)(B).

In *Zenith Electronics Corporation,* the Federal Circuit Court of Appeals noted that "[t]here is substantial agreement among the circuits as to the elements of [§ 43 false advertising] claims, though the precise wording used varies." *Zenith Elec. Corp.,* 182 F.3d at 1347 (citing cases from the Seventh, Ninth, Fifth, Third, and District of Columbia Circuit Courts of Appeals). In view of that substantial agreement, the Federal Circuit Court of Appeals identified the elements of the claim as follows:

As relevant here, the plaintiff (with respect to this claim, Exec [the counter-claimant]) must allege and ultimately prove: (1) that the defendant (Elo Touch) made a false or misleading statement of fact in commercial advertising or promotion about the plaintiff's goods or services; (2) that the statement actually deceives or is likely to deceive a substantial segment of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decisions; (4) that the defendant caused the statement to enter interstate commerce; and (5) that the statement results in actual or probable injury to the plaintiff.

*Id.* at 1347. Indeed, this statement of the elements of the claim substantially agrees with a recent statement of the elements by the Eighth Circuit Court of Appeals. *See, e.g., Blue Dane Simmental Corp. v. American Simmental Ass'n,* 178 F.3d 1035, 1042 (8th Cir.1999) ("To establish a claim under the false advertising prong of the Lanham Act, a plaintiff must prove: (1) that the defendant made a false statement of fact about its product in a commercial advertisement; (2) that the statement actually deceived or has a tendency to deceive a substantial segment of its audience; (3) the deception is likely to influence the purchasing decision; (4) the defendant caused the false statement to enter interstate commerce; and (5) the plaintiffs have been or are likely to be injured as a result.").

However, when the "false advertising" claim under the Lanham Act involved statements that the claimant was infringing the advertiser's patent, the Federal Circuit Court of Appeals found that a sixth element was required to avoid a conflict between patent law and the Lanham Act.

*See Zenith Elec. Corp.,* 182 F.3d at 1351–54. Specifically,

Th[e] privileged right of a patentee to notify the public of its patent rights is statutorily rooted in the patent laws at 35 U.S.C. § 287, which authorizes patentholders to "give notice to the public" of a patent by marking its patented articles and makes marking or specific notice to the accused infringer a prerequisite to the recovery of damages. *See Hunter Douglas,* 153 F.3d at 1336, 47 USPQ2d at 1782.

The previously-described principles for resolving conflict among federal acts require us to recognize this precept of patent law. *See [United States v.] Palumbo Bros.,* 145 F.3d [850,] 862 [ (7th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 375, 142 L.Ed.2d 310 (1998) ]. *Accordingly, we conclude that, before a patentee may be held liable under § 43(a) for marketplace activity in support of its patent, and thus be deprived of the right to make statements about potential infringement of its patent, the marketplace activity must have been undertaken in bad faith. This prerequisite is a function of the interaction between the Lanham Act and patent law, and is in addition to the elements required by § 43(a) itself, as § 43(a) alone does not require bad faith, see,* e.g., *Seven–Up Co. [v. Coca–Cola Co.],* 86 F.3d [1379,] 1383 n. 3 [ (5th Cir.1996) ]; *Brandt Consol[idated, Inc. v. Agrimar Corp.],* 801 F.Supp. 164, 174 [(C.D.Ill. 1992) ] ("bad faith is not an element of this [§ 43(a)] cause of action"); *Procter & Gamble Co. v. Chesebrough–Pond's, Inc.,* 747 F.2d 114, 119 (2d Cir.1984) (plaintiff need not prove bad faith to establish § 43(a) liability).

*Zenith Elec. Corp.,* 182 F.3d at 1353 (emphasis added). Likewise, this court concludes that the additional element of the patentholder's "bad faith" must be shown when the claimant alleges in a § 43 claim that the patentholder has falsely advertised the scope of the patent as covering its *own* products. Obviously, both kinds of claims depend in part upon the actual scope of the patent upon which the challenged advertisement relies. Because the patentee has a "privileged right to notify the public of its patent rights" under 35 U.S.C. § 287, *see id.,* the "bad faith" element concerning the patentholder's assertion of the scope of the patent is just as important to avoiding a conflict between patent law and the Lanham Act on a claim involving the applicability of the patent to the *patentholder's* products as it is for a claim involving the applicability of the patent to an alleged *infringer's* products. *Cf. id.; see also id.* at 1353–54 (discussing further the rationale for the "bad faith" requirement).

There remains, however, the question of what "bad faith" means in this context, a question on which the Federal Circuit Court of Appeals in *Zenith Electronics Corporation* provided only the following guidance:

Exactly what constitutes bad faith remains to be determined on a case by case basis. Obviously, if the patentee knows that the patent is invalid, unenforceable, or not infringed, yet represents to the marketplace that a competitor is infringing the patent, a clear case of bad faith representations is made out. Furthermore, statements to the effect that a competitor is incapable of designing around the patent are inherently suspect. They are suspect not only because with sufficient effort it is likely that most patents can be designed around, but also because such a statement appears nearly impossible to confirm *a priori.* For these reasons, the bad faith element may be much easier to satisfy for statements of this type. *See Mikohn Gaming [Corp. v. Acres Gaming, Inc.],* 165 F.3d [891,] 897, 49 USPQ2d [1308,] 1312 [ (Fed.Cir.1998) ] (noting that "bad faith" may encompass subjective as well as objective considerations, and that the patentee's particular

statements themselves are not irrelevant to determining bad faith).

*Id.* at 1354.

In light of the decision in *Zenith Electronics Corporation* and the allegations here, the elements of Automatic's "false advertising" claim under § 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), are the following: (1) Dethmers made a false or misleading statement of fact in commercial advertising or promotion about either its own or Automatic's goods; (2) *the statement was made in bad faith;* (3) the statement actually deceived or was likely to deceive a substantial segment of the intended audience; (4) the deception was material in that it was likely to influence purchasing decisions; (5) Dethmers caused the statement to enter interstate commerce; and (6) the statement resulted in actual or probable injury to Automatic. *See Zenith Elec. Corp.*, 182 F.3d at 1347 & 1353.

#### 4. The record evidence

##### a. The "patented flex joint" representation

Dethmers's initial grounds for summary judgment on the insufficiency of Automatic's "false advertising" claim, as premised on advertisement that Dethmers's own tow bars contain a "patented flex joint," were (1) that the statement was true, as the original Johnson patent, and later the reissue patent, covered the joint in the EXCALIBAR, and (2) that Automatic cannot show any actual injury from the representation, even if it is otherwise actionable. *See* Dethmers's Memorandum of Authorities In Support Of Plaintiff's Motion For Summary Judgment And To Dismiss For Lack Of Controversy (Dethmers's Brief), pp. 15–16. However, the focus of Dethmers's reply brief as to this portion of the claim is considerably different. In its reply brief, Dethmers argues that it is entitled to summary judgment based on *Zenith Electronics Corporation,* because Automatic has completely failed to offer any evidence that Dethmers acted in bad faith.

The court concludes, however, that Dethmers's "bad faith" was not fairly at issue in Dethmers's motion for summary judgment. It should be remembered that the decision in *Zenith Electronics Corporation* did not come down until July 7, 1999, some three weeks *after* Dethmers moved for summary judgment on this portion of the "false advertising" claim, and only days before Automatic filed its resistance. Thus, the legal basis for Dethmers's contention that Automatic has failed to generate a genuine issue of material fact as to "bad faith" was not even established until after Dethmers had moved for summary judgment. Automatic was not required to guess that there would be such a requirement, when up until the decision in *Zenith Electronics Corporation* was handed down, the "false advertising" claim appeared to be governed by Eighth Circuit law and there was no hint of a "bad faith" requirement in that law. *See Blue Dane Simmental Corp.*, 178 F.3d at 1042 (decision of the Eighth Circuit Court of Appeals decided June 2, 1999, stating elements of a § 43 "false advertising" claim, but stating no "bad faith" requirement).

Nor can the court find that Dethmers's single, *non sequitur* statement in its supporting brief that "[t]here do not appear to be any cases holding that a good faith marking of an article as patented would support a false advertising claim under 15 U.S.C. § 1125(a)," Dethmers's Brief, p. 16, fairly put at issue on the motion for summary judgment the question of Dethmers's good or bad faith. The comment is not supported by any citation of authority standing for the proposition that "bad faith" is a required element, or even by any authority holding that a patentholder generally enjoys protection for "good faith" assertions of patent coverage.

Certainly, Automatic did not have a reasonable opportunity to develop any evidence going to Dethmers's bad faith between the time the *Zenith* decision came

down and the time Automatic was required to respond to the motion for summary judgment. No party appears to have raised or explored that issue in discovery.[11] Indeed, Dethmers, as the movant, has failed to identify those portions of the record that show lack of a genuine issue of fact as to Dethmers's good faith. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The court therefore concludes that the only grounds for summary judgment properly before the court as to Automatic's "false advertising" claim, as that claim relates to representations that Dethmers's tow bars contain a "patented flex joint," are those stated in Dethmers's initial supporting brief: (1) truth or falsity of the representation; and (2) lack of actual injury to Automatic.

*i. Falsity.* As to falsity, Dethmers contends that the "flex joint" of its tow bars was covered by the '240 patent and later by the Re482 patent. However, Automatic has pointed out that, at the time some or all of the representations were made in advertising brochures, only the '240 patent had been issued, so that only that patent can form the basis for Dethmers's assertion. Furthermore, Automatic points out that the '240 patent requires both a "flex joint" and folding tow bar arms, and Dethmers's tow bars lack such folding arms, having instead telescoping arms. The court agrees that the '240 patent requires both a swivel joint, as described in the patent, *and* folding tow bar arms. *See supra* at 950–51; *see also Dethmers*, 23 F.Supp.2d at 988–93 (describing the '240 patent and distinguishing it from the Re482 patent). Thus, there is at least a genuine issue of material fact as to whether Dethmers's representation that a single, non-severable portion of the patent, the "flex joint," was "patented" by itself was literally false or at least misleading, because it fails to represent accurately the nature of the patent, which required both the joint described therein *and* tow bar arms of a specified variety. *See* 15 U.S.C. § 1125(a)(1)(B) (prohibiting "false" or "misleading" representations concerning goods).

It avails Dethmers nothing at this point in the litigation to assert that it could believe in good faith that the telescoping arms of its tow bars were "equivalents" of the folding arms in the '240 patent. Such an argument could be taken by a reasonable jury—as it is by this court—as a concession that the representation is not literally true, and thus is at least a concession that there is a genuine issue of material fact as to whether the patent covered the tow bar as represented. Furthermore, the representation was not that the "tow bar" or the tow bar arms were patented, but that the "flex joint" by itself was patented. Such a statement, again, is at least misleading, because it fails to represent accurately the nature of the patent, which required both the joint described therein *and* tow bar arms of a specified variety. However, whether Dethmers could believe in "good faith" that the patent covered the "flex joint" by itself will presumably be a key issue at trial, if this claim survives Dethmers's motion for summary judgment on other grounds.

---

11. Automatic attempted to generate a genuine issue of material fact as to Dethmers's bad faith during oral arguments on the present motions by asserting that an inference of bad faith arises from the fact that Dethmers did not assert patent infringement against Automatic's purportedly identical device until the Re482 patent issued; thus, Dethmers must have known that the '240 patent did not cover its own device. The court doubts that such an inference of bad faith arises from a patentholder's assertion that its own products are covered by a particular patent while declining to accuse another device of infringing that patent. It is one thing for a patentholder to choose to exercise its right to notify the public of its patent rights under 35 U.S.C. § 287, *see Zenith Elec. Corp.*, 182 F.3d at 1353, and quite another for a patentholder to undertake the heavy, and potentially expensive, task of actually pressing claims of infringement. Nonetheless, the court need not reach the question of whether Automatic has generated a genuine issue of material fact as to Dethmers's "bad faith," because that issue is not properly before the court at this time.

A genuine issue of material fact as to "falsity" of the advertisement precludes summary judgment on this ground on the "patented flex joint" portion of the "false advertising" claim. Fed. R. Civ. P. 56(c) (genuine issues of material fact preclude summary judgment); *Dethmers Mfg. Co., Inc.*, 23 F.Supp.2d at (same). The court will therefore turn to Dethmers's second ground for summary judgment, that Automatic cannot generate a genuine issue of material fact that it was actually injured by the "patented flex joint" representation, even assuming that the representation was false.

*ii. Injury.* Dethmers's motion for summary judgment on the portion of the "false advertising" claim attacking the "patented flex joint" representations stands on better ground as to Dethmers's contention that Automatic cannot satisfy the "injury" element of the claim. However, at the outset, Dethmers is incorrect in asserting that Automatic must show "actual" injury, because both the statute and the Federal Circuit Court of Appeals require proof of either "actual" or "probable" injury. *See* 15 U.S.C. § 1125(a) (authorizing a civil action, in part, by "any person who believes that he or she is *or is likely* to be damaged by such act") (emphasis added); *Zenith Elec. Corp.*, 182 F.3d at 1347 (stating element five of the claim as "the statement results in actual *or probable* injury to the plaintiff") (emphasis added). Nonetheless, Automatic has failed to generate a genuine issue of material fact as to either its "actual" or "probable" injury from this alleged misrepresentation.

In its resistance brief, Automatic responds to this ground for summary judg-ment by asserting only the following: "The extent of the harm suffered by Automatic as a result of such unfair, bad faith marketing tactics by Dethmers is a genuine issue of material fact to be ascertained from further discovery, with the evidence obtained therefrom to be provided at trial by the damage experts; summary judgment would be inappropriate." Automatic's Resistance Brief, p. 20. More is required of the party resisting summary judgment than an assertion that "further discovery" will support a damages claim. Rather, as pointed out in this court's prior ruling on motions for summary judgment, "the nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Dethmers Mfg. Co., Inc.*, 23 F.Supp.2d at 1013 (internal quotation marks omitted) (quoting *Glaverbel*, 45 F.3d at 1560, in turn quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548). Automatic has completely failed to designate such record evidence demonstrating genuine issues of material fact as to its "injury" from false advertising. Furthermore, the Federal Circuit Court of Appeals has stated that "[a] party cannot forestall summary judgment by arguing that it has not had an opportunity to complete its discovery when it has not pursued its discovery rights with vigor." *Scosche Indus., Inc. v. Visor Gear, Inc.*, 121 F.3d 675, 682 (Fed.Cir.1997): Automatic has not indicated why the pertinent discovery has not yet been completed, when Dethmers's motion for summary judgment was filed at the deadline for dispositive motions, and trial in this matter is set to begin October 18, 1999.[12]

---

12. At one time, discovery on damages issues was stayed. *See* Order of January 3, 1997. However, by order dated September 23, 1997, discovery on damages issues was to commence on October 1, 1998, and the deadline for such discovery was January 15, 1999. By order dated November 5, 1998, the deadline for the identification of damages experts was extended to December 1, 1998, and the deadline for discovery on the merits was extended to February 1, 1999. Automatic in fact identified its damages expert on December 1, 1998. A supplemental scheduling order of January 7, 1999, set the deadlines for all discovery and dispositive motions as June 1, 1999. On May 25, 1999, the dispositive motion deadline was extended to June 15, 1999, but there has been no further motion to extend the deadline for discovery, which expired June 1, 1999. The court understands

■ Instead of resisting the motion for summary judgment at this time, Automatic could have requested a continuance to obtain the necessary evidence to respond to the summary judgment motion pursuant to Rule 56(f) of the Federal Rules of Civil Procedure,[13] but Automatic did not do so. District courts enjoy broad discretion under Rule 56(f) to determine when continuances are appropriate to avoid premature summary dispositions. *See Simmons Oil Corp. v. Tesoro Petroleum Corp.*, 86 F.3d 1138, 1144–45 (Fed.Cir.1996). However,

> [i]n moving for relief under Rule 56(f), a party must demonstrate specifically "how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact." *Willmar Poultry Co. v. Morton–Norwich Prods., Inc.*, 520 F.2d 289, 297 (8th Cir.1975), *cert. denied*, 424 U.S. 915, 96 S.Ct. 1116, 47 L.Ed.2d 320 (1976). The party "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts." *Securities & Exchange Comm'n v. Spence & Green Chem. Co.*, 612 F.2d 896, 901 (5th Cir.1980), *cert. denied*, 449 U.S. 1082, 101 S.Ct. 866, 66 L.Ed.2d 806 (1981). The rule does not require clairvoyance on the part of the moving party, *Enplanar, Inc. v. Marsh*, 11 F.3d 1284, 1292 (5th Cir.), *cert. denied*, 513 U.S. 926, 115 S.Ct. 312, 130 L.Ed.2d 275 (1994), but the movant is "required to state with some precision the materials he hope[s] to obtain with further discovery, and exactly how he expect[s] those materials would help him in opposing summary judgment." *Krim*

*v. BancTexas Group, Inc.*, 989 F.2d 1435, 1443 (5th Cir.1993). It is not enough simply to assert, a la [the non-movant in the case], that "something will turn up."

*Simmons Oil Corp.*, 86 F.3d at 1144.

Although this court has in the past liberally construed requests for further discovery in resistance to motions for summary judgment as motions pursuant to Rule 56(f), even if the movant failed to comply with the strict formalities for such a motion, Automatic's reference to further discovery utterly fails to meet the necessary requirements and is not even cast in terms of a request to pursue such discovery and hold the motion for summary judgment in abeyance. Rather, Automatic's reference to "further discovery" is the sort of "vague assertio[n] that additional discovery will produce needed, but unspecified, facts" found insufficient by the Federal Circuit Court of Appeals to support a Rule 56(f) motion. *Simmons Oil Corp.*, 86 F.3d at 1144. Furthermore, Automatic has had ample time to pursue discovery over the last three years, and has shown that it knows how to request an extension of time to complete discovery. Its failure to comply with the requirements of Rule 56(f) for a continuance to complete discovery or to comply with the requirements for resisting a motion for summary judgment under Rule 56(c) is not excusable in these circumstances.

Because Automatic has failed to generate a genuine issue of material fact on an essential element of its "false advertising" claim premised on the "patented flex joint" representation, the element of "injury," *see Zenith Elec. Corp.*, 182 F.3d at 1347 (iden-

---

from comments of counsel for both sides at the oral arguments that discovery in this case is continuing, even though the discovery deadline has passed and trial is imminent. The fact that the parties have agreed to continue discovery beyond the deadline does not excuse Automatic's failure to respond properly to the summary judgment motion.

**13.** Rule 56(f) provides as follows:

(f) When Affidavits are Unavailable. Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

FED. R. CIV. P. 56(f).

tifying "injury" as an element of the claim), and has not properly requested that the court hold disposition of the motion for summary judgment in abeyance pending further discovery on that issue pursuant to Rule 56(f), this portion of the claim is ripe for summary judgment. *See* FED. R. CIV. P. 56(c) ("[t]he judgment sought shall be rendered forthwith if ... there is not genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law"); *Dethmers*, 23 F.Supp.2d at 1012. Dethmers's motion for summary judgment on Automatic's "false advertising" claim as to the "patented flex joint" representation will therefore be granted.

### b. The infringement representations

■ The second portion of Automatic's "false advertising" claim is premised on alleged representations by Dethmers that Automatic is infringing its patents. Answer to Third Supplemental Amended Complaint and Amended Counterclaim, Counterclaim, Count II, ¶ 10. Dethmers initially moved for summary judgment on this portion of the "false advertising" claim on the grounds that Automatic had failed to set forth the details of the alleged misrepresentations, and assuming Automatic was referring to occasional statements by Dethmers's sales representatives to potential customers, such "scattered" statements do not constitute "advertisement" or "promotion" within the meaning of a claim under § 43 of the Lanham Act, 15 U.S.C. § 1125(a). Furthermore, Dethmers contended that the statements were not false, because Automatic's engineers have admitted that Automatic's tow bars infringe the Re482 patent, even if that patent is invalid. In its resistance, Automatic asserted that at the time some or all of the statements upon which this portion of the claim is based were made, the only patent upon which Dethmers could have relied was the original '240 patent, which required a tow bar with pivot arms, which Automatic's tow bars lack. Automatic now asserts that the statements were made at trade shows, which it argues is a sufficiently commercial context in the tow bar industry to constitute "advertising" or "promotion" within the meaning of § 43 of the Lanham Act. In reply, Dethmers now contends that Automatic has still not pointed to a shred of evidence that the statements were made at any trade shows, or which trade shows, let alone what the statements were.

The record reveals no more than hearsay statements of Automatic representatives that certain customers told Automatic that Dethmers was suggesting that Automatic's products infringed Dethmers patents and that Automatic would be put out of the tow bar business by the present litigation. Even supposing such hearsay could form an adequate evidentiary basis to overcome a motion for summary judgment, the evidence still does not indicate the specific content or context of the statements such that no genuine issue of material fact is generated that the statements were "statement[s] of fact in commercial advertising or promotion about the [claimant's] goods or services." *See Zenith Elec. Corp.*, 182 F.3d at 1347 (first element of a "false advertising" claim). Thus, Automatic has once again failed to carry its burden to "go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial" on this portion of its "false advertising" claim. *Dethmers Mfg. Co., Inc.*, 23 F.Supp.2d at 1013 (internal quotation marks omitted) (quoting *Glaverbel*, 45 F.3d at 1560, in turn quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548). Therefore, Dethmers is also entitled to summary judgment on this portion of Automatic's "false advertising" claim.

Consequently, summary judgment in favor of Dethmers shall be granted on the entirety of Count II of Automatic's counterclaim.

### D. False Marking

■ Finally, Dethmers has moved for summary judgment on Automatic's "false marking" claim pursuant to 35 U.S.C.

§ 292. The statute upon which the claim relies, in pertinent part, provides as follows:

> Whoever marks upon, or affixes to, or uses in advertising in connection with an unpatented article, the word "patent" or any word or number importing that the same is patented, for the purpose of deceiving the public ... shall be fined not more than $500 for every such offense.

35 U.S.C. § 292. The gravamen of Automatic's "false marking" claim is that Dethmers advertised its tow bars as containing a "patented flex joint" when the tow bars were not patented and that Dethmers did so for the purpose of deceiving the public. Answer to Third Supplemental Amended Complaint and Amended Counterclaim, Counterclaim, Count III, ¶ 18.

Dethmers has moved for summary judgment on this claim on the ground that its tow bars are covered by the original '240 patent or the Re482 patent, so that the challenged "markings" are not false, and more fundamentally, on the ground that Dethmers believed the statements to be true, so that there is no evidence of any intent to deceive the public. Automatic has resisted the motion on the ground that, at the time the "markings" were made, the only patent upon which the statement was made was the '240 patent, and the Dethmers tow bars shown in its brochures containing the "marking" do not contain the "pivot block" limitation of the '240 patent. "At a minimum," Automatic contends, "whether the misrepresentation of the 'flex joint' of the EXCALI-BAR tow bar as being patented was 'for the purpose of deceiving the public' is a genuine issue of material fact, the resolution of which is not appropriate for summary judgment." Automatic's Resistance Brief, p. 24. In reply, Dethmers asserts that Automatic cannot escape summary judgment by merely arguing that there is a genuine issue of material fact as to intent to deceive, and Automatic has failed to

point to any record evidence tending to show such an intent to deceive.

Because this claim is not only pursuant to a patent statute, but plainly involves the "scope of patents," the court finds that this claim is also governed by the law of the Federal Circuit. *See Zenith Elec. Corp.,* 182 F.3d at 1346. The Federal Circuit Court of Appeals has explained that "[a]s a general proposition, there can be no violation of § 292 absent an evidentiary showing that the false marking or mismarking was 'for the purpose of deceiving the public.' " *Arcadia Machine & Tool, Inc. v. Sturm, Ruger & Co., Inc.,* 786 F.2d 1124, 1125 (Fed.Cir.1986) (quoting the statute).

The court agrees that Automatic's showing of intent to deceive in its written resistance to Dethmers's motion for summary judgment amounts to no more than an assertion that such evidence may be available, but Automatic has once again failed to meet its burden to "go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial" as to Dethmers's intent to deceive on Automatic's "false marking" claim. *Dethmers Mfg. Co., Inc.,* 23 F.Supp.2d at 1013 (internal quotation marks omitted) (quoting *Glaverbel,* 45 F.3d at 1560, in turn quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548). Automatic's bald assertion that "intent to deceive" is subject to genuine issues of material fact is insufficient to comply with the requirements of Rule 56.

At oral arguments, Automatic attempted to generate a genuine issue of material fact on Dethmers's "intent to deceive" on this claim, as it had on Dethmers's "bad faith" on Automatic's "false advertising" claim, by pointing to Dethmers's marking of its own tow bars as "patented" at a time when only the '240 patent was available to justify such marking, while refraining from pressing infringement claims under that patent against a purportedly identical tow bar made by Automatic until after the

Re482 patent issued. The court cannot find that a genuine issue of material fact on "intent to deceive" arises from a patentholder's public notification of patent rights, pursuant to 35 U.S.C. § 287, while declining to pursue enforcement litigation, even if notice of patent rights is a prerequisite to recovering damages on an infringement claim. *See Zenith Elec. Corp.*, 182 F.3d at 1353. A patentholder has the right to remain "quiescent" in the *enforcement* of its patent rights. *See, e.g., Hunter Douglas, Inc.*, 153 F.3d at 1326–27 ("for an actual controversy [for a declaratory judgment suit by an accused infringer] more is required than the existence of an adversely held patent" in order to "protec[t] quiescent patent owners against unwarranted litigation" under Title 35). Just as the mere existence of a patent does not establish a case or controversy for a declaratory judgment action by a party fearing accusations of infringement, the mere giving of notice of patent rights does not require a patentholder to pursue any other enforcement of its rights, and certainly the patentholder's decision to rest upon its notice of rights does not give rise to any inference that the notice was given with the intent to deceive the public.

Therefore, Dethmers is also entitled to summary judgment on Automatic's "false marking" claim, because Automatic has failed to generate a genuine issue of material fact as to the "intent to deceive" element of such a claim. *See* Fed. R. Civ. P. 56(c) ("[t]he judgment sought shall be rendered forthwith if . . . there is not genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law"); *Dethmers*, 23 F.Supp.2d at 1012.

### III.  CONCLUSION

The court will briefly reprise *seriatim* its conclusions on this second round of dispositive motions in this complex and detailed litigation. That portion of Dethmers's June 16, 1999, Motion for Summary Judgment and to Dismiss for Lack of Con-troversy asserting that there is no present controversy between Automatic and Dethmers regarding the '851 patent is granted. The court concludes that it does not have subject matter jurisdiction over Count V of Automatic's counterclaim concerning non-infringement, unenforceability, and invalidity of the '851 patent, because Automatic has failed to establish either prong of the "actual controversy" requirement for such a claim. Furthermore, Automatic's June 15, 1999, Motion for Summary Judgment of Invalidity of U.S. Patent No. 5,765,851 is denied for lack of subject matter jurisdiction and Count V of Automatic's counterclaim is dismissed.

Next, that portion of Dethmers's June 16, 1999, Motion for Summary Judgment and to Dismiss for Lack of Controversy asserting that Dethmers is entitled to summary judgment on both its claim of non-infringement and Automatic's claim of infringement of the '166 patent is granted. In light of an unrebutted *Warner–Jenkinson* presumption as to either of the two elements of the '166 patent at issue here, the court must conclude that prosecution history estoppel bars the application of the doctrine of equivalents as to those elements and the court has previously determined that Dethmers's accused devices do not literally infringe the '166 patent. *See Dethmers*, 23 F.Supp.2d at 1037 & 1039. Summary judgment in Dethmers's favor is therefore granted on Count I of Dethmers's Third Amended and Substituted Complaint and on Count IV of Automatic's Counterclaim.

That portion of Dethmers's June 16, 1999, Motion for Summary Judgment and to Dismiss for Lack of Controversy seeking summary judgment on Automatic's counterclaim of "false advertising" is granted. Automatic has failed to generate a genuine issue of material fact on the element of "injury" on that portion of its "false advertising" claim premised on the "patented flex joint" representation, and has not properly requested that the court hold disposition of the motion for sum-

mary judgment in abeyance pending further discovery on that issue pursuant to Rule 56(f). On that portion of the "false advertising" claim premised on "infringement" representations, the evidence does not indicate the specific content or context of the statements such that no genuine issue of material fact is generated that the statements were statements of fact in commercial advertising or promotion about Automatic's goods or services. Summary judgment in Dethmers's favor is therefore granted on Count II of Automatic's Counterclaim.

Finally, that portion of Dethmers's June 16, 1999, Motion for Summary Judgment and to Dismiss for Lack of Controversy seeking summary judgment on Automatic's counterclaim of "false marking" is granted. Automatic has failed to generate a genuine issue of material fact as to the "intent to deceive" element of such a claim. Summary judgment in Dethmers's favor is therefore granted on Count III of Automatic's Counterclaim.

**IT IS SO ORDERED.**